Town Bank, a Wisconsin Banking Corporation,
Plaintiff-Appellant,

v.

City Real Estate Development, LLC,
Defendant-Respondent-Petitioner.

Supreme Court

*No. 2008AP1845. Oral argument September 7, 2010.*
*—Decided December 14, 2010.*

2010 WI 134

(Also reported in 793 N.W.2d 476.)

340

For the defendant-respondent-petitioner there were briefs by *Thad W. Jelinske, Michael J. Anderson* and *Mawicke & Goisman, S.C.*, Milwaukee, and oral argument by *Thad W. Jelinske*.

For the plaintiff-appellant there was a brief by *Paul R. Erickson, Kari H. Race* and *Gutglass, Erickson, Bonville & Larson, S.C.*, Milwaukee, and oral argument by *Paul R. Erickson*.

An amicus curiae brief was filed by *John E. Knight, James E. Bartzen, Kirsten E. Spira* and *Boardman, Suhr, Curry & Field LLP* for the Wisconsin Bankers Association.

¶ 1. ANNETTE KINGSLAND ZIEGLER, J. This is a review of a published decision of the court of appeals, *Town Bank v. City Real Estate Dev., LLC*, 2009 WI App

160, 322 Wis. 2d 206, 777 N.W.2d 98, which reversed the orders of the Waukesha County Circuit Court, Judge Paul F. Reilly presiding, denying Town Bank's two motions for summary judgment.

¶ 2. Town Bank and City Real Estate Development, LLC (City Real Estate) entered into a Term Credit Agreement (the TCA), through which Town Bank loaned $2,500,000 to City Real Estate for the purpose of acquiring an office building in downtown Milwaukee. Town Bank seeks a declaratory judgment that it fully complied with the TCA and is not obligated to provide additional financing to City Real Estate under the terms of a previously-issued commitment letter (the commitment letter).

¶ 3. Town Bank twice moved for summary judgment, which the circuit court denied. Because those motions were denied, the case proceeded to a jury trial. The jury returned a verdict in favor of City Real Estate. Town Bank appealed, and the court of appeals reversed.

¶ 4. On appeal to this court, City Real Estate argues that the TCA is ambiguous, and as such, the circuit court properly denied summary judgment and directed the case to trial. According to City Real Estate, it is not clear whether the parties intended the TCA to be the final expression of only the first of two financing phases, or whether the parties intended the TCA to be the final expression of the parties' financing agreement altogether. As evidence of the former, City Real Estate points to the commitment letter and various credit memoranda prepared by Town Bank, all of which reference a two-phase financing arrangement.

¶ 5. We conclude that the TCA is an unambiguous, fully integrated agreement with which Town Bank fully complied. Accordingly, Town Bank should have been granted summary judgment, and the case should

345

not have proceeded to a jury trial. We agree with Town Bank that the TCA contains an unambiguous merger clause which precluded City Real Estate from introducing any evidence of prior understandings or agreements that may have existed between the parties, including the commitment letter. Even assuming, without deciding, that the commitment letter constitutes a separate and enforceable contract for financing, we conclude that Town Bank was within its rights to terminate the agreement. It is undisputed that City Real Estate did not fulfill at least two of the conditions set forth in the commitment letter. We therefore affirm the decision of the court of appeals.

## I. FACTUAL BACKGROUND

¶ 6. In March 2004 the managing member of City Real Estate, David Leszczynski (Leszczynski), approached Town Bank to secure financing for City Real Estate's proposed acquisition and renovation of a 22–story office building in downtown Milwaukee known as the Wisconsin Tower. City Real Estate's development plan consisted of acquiring the building, demolishing and refurbishing its interior, and converting the space into 65 residential condominium units.

¶ 7. On April 1, 2004, Town Bank's Vice President of Business Banking, Christopher Zirbes (Zirbes), prepared a loan write-up and recommended approval of a $9,000,000 loan to City Real Estate for the purpose of "purchas[ing] and construct[ing] retail space and condominiums in the Wisconsin Tower in downtown Milwaukee." The write-up indicated an initial draw of $2,500,000 to be put towards the building's purchase price. In addition, the write-up contemplated that the "[p]rimary source of repayment will come from [the] sale of condominium units."

346

¶ 8. On May 27, 2004, Town Bank sent Leszczyn-
ski a letter (the commitment letter), which stated that
Town Bank "is pleased to provide [City Real Estate]
with a financing commitment for a $9,000,000 Con-
struction Line."[1] Relevant for our purposes, the com-
mitment letter outlined several terms and conditions,
including a credit facility that divided the $9,000,000
construction line into two phases: "A) $2,500,000 initial
funding for acquisition of building and completion of
demolition, engineering, asbestos removal and market-
ing," and "B) $6,500,000 additional funding for the
construction of condominium units as pre-sales dic-
tate." The latter provision further noted that "[b]ank
financing will be based on 75% of the pre-sold units." As
collateral for Town Bank's commitment to City Real
Estate, Town Bank was to receive, *inter alia*, a "1st R/E
mortgage on [the] Subject Property."

¶ 9. In addition, the commitment letter provided
that the "[c]losing of [the] loan is contingent upon but
not limited to" four conditions:

A. Subject to satisfactory review of appraisal, title
 commitment, Environmental report, construction
 plans, and final review of loan documents by the
 Bank's legal counsel.

B. Borrower agrees to contribute $900,000 in up front
 equity capital prior to closing.

C. Borrower agrees to pay closing costs, including
 title, filing and documentation.

D. Borrower and guarantors agree to provide annual
 personal financial statements and tax returns.

¶ 10. Finally, the commitment letter contained the
following clause: "In order to be effective in any regard,

---

[1] The May 27, 2004, commitment letter expressly super-
seded an earlier letter dated April 13, 2004.

347

this letter must be properly executed and returned to the Bank by June 11, 2004. This commitment may be terminated at the sole option of Town Bank if the credit agreement is not executed by June 25, 2004."

¶ 11. While City Real Estate timely executed and returned the commitment letter, it is undisputed that a credit agreement between Town Bank and City Real Estate was not executed by June 25, 2004. However, on July 15, 2004, the parties entered into the TCA, and Town Bank loaned $2,500,000 to City Real Estate. The TCA incorporated by reference a Business Note (the Business Note), also dated July 15, 2004, in which City Real Estate promised to pay to Town Bank the sum of $2,500,000 plus interest by August 15, 2004.

¶ 12. According to Zirbes and Jay Mack (Mack), Town Bank's President and Chief Executive Officer, the TCA was intended to fund City Real Estate's purchase of the Wisconsin Tower. Earlier that month, Leszczynski had represented to Town Bank that City Real Estate's option to buy the building was about to expire and that Ruth's Chris Steak House, a major commercial tenant with whom City Real Estate had been negotiating, refused to sign a letter of intent until City Real Estate owned the building.[2]

---

[2] On July 14, 2004, Zirbes prepared an internal memorandum for Town Bank's credit file. The memorandum stated, in relevant part:

> Because of timing issues with Ruth's Chris and the fact that they will not sign a letter of intent to take the space until [Leszczynski] owns the building[,] Town Bank will be closing the loan to the [City Real Estate] LLC in two phases. The first phase is closing on July 15th for $2,500,000 for the purchase of the building. The loan will be a 60 day note funding into the $9,000,000 construction loan that was approved in April of this year.

¶ 13. The TCA is a standard form lending document sold to lenders by the Wisconsin Bankers Association. The first section of the TCA is entitled "Term Loan" and provides that the parties must "[c]heck" the box of one of two options: "(a) Single Note; Multiple Advances," or "(b) Multiple Notes; Multiple Advances." In this case, the second box was checked. By checking the second box, the parties gave effect to the following provision:

> If checked here, and in consideration of extensions of credit from Lender to Customer from time to time, Lender and Customer agree that sections 4 through 19 of this Agreement shall apply to each such extension of credit unless evidenced by a document which states it is not subject to this Agreement. The term "Loan" includes all such extensions of credit. The term "Note" includes each promissory note evidencing Customer's obligation to repay an extension of Credit. This Agreement does not constitute a commitment by Lender to make such extensions of credit to Customer.

¶ 14. Relevant to this case, section 14 of the TCA bears the heading "Entire Agreement" and provides:

> This Agreement, including the Exhibits attached or referring to it, the Note and the Security Documents, are intended by Customer and Lender as a final expression of their agreement and as a complete and exclusive statement of its terms, there being no conditions to the full effectiveness of their agreement except as set forth in this Agreement, the Note and the Security Documents.

Three exhibits were attached to the TCA. Exhibit A is substantively blank and states that it is "Not Applicable." Exhibit B provides a list of "Security Documents," including a Chattel Security Agreement, a Mortgage on the building, and an Assignment of Leases

and Rents on the building. Exhibit C lists several "Additional Covenants," none of which are material to this case.

¶ 15. It is undisputed that the TCA does not expressly mention the commitment letter.

¶ 16. On July 16, 2004, City Real Estate closed on the purchase of the Wisconsin Tower for $2,500,000. Thereafter, Town Bank continued to monitor City Real Estate's progress on the building. On August 26, 2004, Zirbes prepared an internal memorandum for Town Bank's credit file, in which he recognized that "[t]he marketing of the building has started off slower than originally anticipated." Zirbes further noted:

> Last month we decided to close this loan in two phases allowing [City Real Estate] to purchase the building and begin negotiations with Ruth's Chris, with the understanding that phase II (the construction loan) would begin when they sta[r]ted to get some pre-sold condo units. Because of the fact that they are behind schedule with their marketing, we are looking to extend the interest only period on the building for an additional 3 month period to allow for some pre-solds.

In a loan write-up dated October 14, 2004, Zirbes recommended a three-month extension on the interest period of the $2,500,000 loan "before starting the construction phase of the loan."

¶ 17. On October 19, 2004, a meeting was held between Leszczynski, Zirbes, Mack, and loan officer Terry O'Connor to discuss the progress of the Wisconsin Tower. At that time, according to Zirbes, Town Bank learned that Ruth's Chris Steak House was no longer a prospective tenant and that City Real Estate had no condominium pre-sales. Furthermore, City Real Estate had not infused its $900,000 in equity into the project, as required by the commitment letter. According to

Zirbes, Town Bank then informed Leszczynski that any construction financing would have to be reapproved.

¶ 18. On November 19, 2004, Zirbes memorialized the meeting in a letter to Leszczynski:

> As we discussed at our meeting on Tuesday, October 19, 2004, Town Bank's April 13 commitment to provide construction financing to City Real Estate Development LLC is no longer effective and in order for the Bank to finance the construction of your condominium project, the loan must be re-approved by the Bank's loan committee.

As Zirbes noted, by that time, the loan committee had changed as a result of WinTrust Financial's October 2004 purchase of Town Bank.

¶ 19. On December 28, 2004, Zirbes sent another letter to Leszczynski, reiterating that "the loan commitment dated April 13 is no longer effective" and that a construction loan would require the loan committee's approval. Zirbes explained, however, that the loan committee had reservations about City Real Estate's project:

> Since the Bank originally approved the loan to City Real Estate Development LLC, you requested the Bank to change the loan structure in order to accommodate your need to close on the purchase of the property. The Bank agreed to make the acquisition loan with the understanding that a lease from Ruth's Chris would be signed and condominium units would be sold prior to entering into a construction loan. Instead, your prospects for obtaining Ruth's Chris as a tenant have faded and you have not obtained enough unit presales to fund construction without additional equity.

While Town Bank agreed to extend City Real Estate's $2,500,000 loan to February 15, 2005, Zirbes advised

351

Leszczynski that a construction loan would not be approved based upon the current circumstances and that Leszczynski "should seek construction lending from other lenders."

¶ 20. In September 2005, City Real Estate secured alternative construction financing through M&I Bank and Horicon State Bank, and upon closing those loan transactions, repaid Town Bank in full for the $2,500,000 loan.

## II. PROCEDURAL POSTURE

¶ 21. On January 6, 2006, Town Bank filed a complaint against City Real Estate, seeking a declaratory judgment that City Real Estate failed to satisfy its obligations under the commitment letter and that Town Bank was not obligated to provide additional financing.

¶ 22. In its answer, City Real Estate affirmatively alleged that it satisfied all contingencies set forth in the commitment letter and requested that the court dismiss Town Bank's complaint. In addition, City Real Estate counterclaimed for damages arising out of Town Bank's alleged breach of the commitment letter for failing to advance to City Real Estate the $6,500,000 of additional financing.

¶ 23. On October 16, 2006, Town Bank filed its first of two motions for summary judgment. Town Bank argued that its obligations to City Real Estate were governed entirely by the TCA and that Town Bank fulfilled those obligations when it funded $2,500,000 to City Real Estate on July 15, 2004. Town Bank contended that the TCA contained an unambiguous merger clause which prevented City Real Estate from introducing any evidence of prior understandings or

agreements that may have existed between the parties, including the commitment letter.

¶ 24. The circuit court denied Town Bank's first motion for summary judgment in an order dated January 24, 2007. The circuit court determined that the case was not ripe for summary judgment, namely on the grounds that the TCA was ambiguous.

¶ 25. On October 19, 2007, Town Bank filed its second motion for summary judgment, again arguing that the TCA was an unambiguous stand-alone agreement with which Town Bank fully complied. In the alternative, assuming that the commitment letter was enforceable, Town Bank argued that City Real Estate failed to satisfy several of its underlying conditions, including the requirement that a credit agreement be executed by June 25, 2004, and the obligation to contribute $900,000 in up-front equity.

¶ 26. On January 3, 2008, the circuit court denied Town Bank's second motion for summary judgment and set the case for a jury trial. The circuit court determined that genuine issues of material fact precluded summary judgment, including whether the TCA was a stand-alone agreement and if not, whether City Real Estate breached the commitment letter.

¶ 27. Because the circuit court denied Town Bank's motions for summary judgment, the case proceeded to a six-day jury trial. On May 6, 2008, the jury returned a verdict in favor of City Real Estate. The special verdict form consisted of three questions. First, the jury was asked if Town Bank and City Real Estate entered into a contract as set forth in the commitment letter. The jury answered, "Yes." Second, the jury was asked if Town Bank breached that contract. The jury answered, "Yes." Third, the jury was asked to determine the sum of money that would fairly and reasonably

compensate City Real Estate for its damages. The jury awarded $600,000 to City Real Estate.

¶ 28. On June 26, 2008, the circuit court entered judgment on the jury verdict and ordered Town Bank to pay $600,000, plus fees and costs, to City Real Estate.

¶ 29. Town Bank appealed. The court of appeals reversed and remanded, instructing the circuit court to enter judgment for Town Bank. *Town Bank*, 322 Wis. 2d 206. The court of appeals held that the TCA was unambiguous and constituted the only agreement under which Town Bank had loan obligations to City Real Estate. *Id.*, ¶ 2. First, the court of appeals concluded that the TCA's integration clause, which neither party challenged as ambiguous, barred the introduction into evidence of any prior agreement to vary the terms of the TCA. *Id.*, ¶¶ 11–12. Next, the court of appeals turned to the commitment letter and concluded that Town Bank had no additional loan obligations thereunder because City Real Estate failed to meet its terms and conditions. *Id.*, ¶¶ 14–17. In particular, the court of appeals found no evidence that Town Bank received a mortgage on the Wisconsin Tower as collateral, no evidence that a credit agreement was executed by June 25, 2004, *id.*, ¶ 15, and finally, no evidence that City Real Estate contributed $900,000 in up-front equity, *id.*, ¶ 16. As such, the court of appeals deemed the commitment letter repudiated and held that the circuit court erred in denying Town Bank's motion for summary judgment. *Id.*, ¶ 18.

¶ 30. City Real Estate petitioned this court for review, which we granted on March 9, 2010. We now affirm.

354

## III. STANDARD OF REVIEW

■■

¶ 31. Our review of this case implicates several standards of review. As a general matter, we are reviewing the circuit court's denial of Town Bank's two motions for summary judgment. Whether the circuit court properly denied summary judgment is a question of law that we review de novo, applying the well-recognized standards used by the circuit court and set forth in Wis. Stat. § 802.08 (2007–08). *Tatera v. FMC Corp.*, 2010 WI 90, ¶ 15, 328 Wis. 2d 320, 786 N.W.2d 810; *Racine County v. Oracular Milwaukee, Inc.*, 2010 WI 25, ¶ 24, 323 Wis. 2d 682, 781 N.W.2d 88. While summary judgment is considered a drastic remedy which should not be granted when material facts are in dispute, this court has recognized that "without doubt a trial court can and should grant a motion for summary judgment in those instances where the controlling material facts are not in dispute and the application of the law to those facts is not doubtful." *Matthew v. Am. Family Mut. Ins. Co.*, 54 Wis. 2d 336, 339, 195 N.W.2d 611 (1972).

■■

¶ 32. In this case, we are called upon to interpret the TCA. The interpretation of an unambiguous contract presents a question of law for this court's independent review. *Admanco, Inc. v. 700 Stanton Drive, LLC*, 2010 WI 76, ¶ 15, 326 Wis. 2d 586, 786 N.W.2d 759. Conversely, when a contract is ambiguous and consequently is properly construed by use of extrinsic evidence, the contract's interpretation presents a question of fact for the jury. *Mgmt. Computer Servs., Inc. v. Hawkins, Ash, Baptie & Co.*, 206 Wis. 2d 158, 177, 557 N.W.2d 67 (1996).

## IV. ANALYSIS

¶ 33. This court has long recognized the importance of protecting parties' freedom to contract. *See, e.g., Solowicz v. Forward Geneva Nat'l, LLC*, 2010 WI 20, ¶¶ 34, 41, 323 Wis. 2d 556, 780 N.W.2d 111; *Whirlpool Corp. v. Ziebert*, 197 Wis. 2d 144, 148, 539 N.W.2d 883 (1995); *Watts v. Watts*, 137 Wis. 2d 506, 521, 405 N.W.2d 303 (1987); *Kuhl Motor Co. v. Ford Motor Co.*, 270 Wis. 488, 493, 71 N.W.2d 420 (1955). When construing contracts that were freely entered into, our goal is "is to ascertain the true intentions of the parties as expressed by the contractual language." *State ex rel. Journal/Sentinel, Inc. v. Pleva*, 155 Wis. 2d 704, 711, 456 N.W.2d 359 (1990); *see also Solowicz*, 323 Wis. 2d 556, ¶ 34. Stated another way, the best indication of the parties' intent is the language of the contract itself, *Levy v. Levy*, 130 Wis. 2d 523, 535, 388 N.W.2d 170 (1986), for that is the language the parties "saw fit to use," *Journal/Sentinel*, 155 Wis. 2d at 711. We construe the contract language according to its plain or ordinary meaning. *Huml v. Vlazny*, 2006 WI 87, ¶ 52, 293 Wis. 2d 169, 716 N.W.2d 807. "If the contract is unambiguous, our attempt to determine the parties' intent ends with the four corners of the contract, without consideration of extrinsic evidence." *Id.* Only when the contract is ambiguous, meaning it is susceptible to more than one reasonable interpretation, may the court look beyond the face of the contract and consider extrinsic evidence to resolve the parties' intent. *Capital Invs., Inc. v. Whitehall Packing Co.*, 91 Wis. 2d 178, 190, 280 N.W.2d 254 (1979).

¶ 34. In this case, City Real Estate argues that the TCA is ambiguous, and as such, the circuit court properly denied summary judgment and directed the

case to trial. In particular, according to City Real Estate, it is not clear whether the parties intended the TCA to be the final expression of only the $2,500,000 acquisition financing with which the TCA dealt (and the first of two financing phases), or whether the parties intended the TCA to be the final expression of the parties' financing agreement altogether. As evidence of the former, City Real Estate points to the commitment letter and various credit memoranda prepared by Town Bank, all of which reference a two-phase financing arrangement.

¶ 35. In response, Town Bank argues that the TCA is an unambiguous stand-alone agreement with which it fully complied when it funded $2,500,000 to City Real Estate. Town Bank relies on section 14 of the TCA, contending that it constitutes an unambiguous merger clause which should have precluded City Real Estate from introducing evidence of any prior understandings or agreements that may have existed between the parties, including the commitment letter.

■■■■

¶ 36. The parties' arguments implicate the parol evidence rule. Despite its name, the parol evidence rule is not a rule of evidence; it is a rule of substantive contract law. *Dairyland Equip. Leasing, Inc. v. Bohen*, 94 Wis. 2d 600, 607, 288 N.W.2d 852 (1980); *Fed. Deposit Ins. Corp. v. First Mortg. Investors*, 76 Wis. 2d 151, 156, 250 N.W.2d 362 (1977); *Conrad Milwaukee Corp. v. Wasilewski*, 30 Wis. 2d 481, 488, 141 N.W.2d 240 (1966); 6 Arthur Linton Corbin, *Corbin on Contracts* § 573, at 72–73 (interim ed. 2002). This court has stated the parol evidence rule as follows:

> When the parties to a contract embody their agreement in writing and intend the writing to be the final

357

expression of their agreement, the terms of the writing may not be varied or contradicted by evidence of any prior written or oral agreement in the absence of fraud, duress, or mutual mistake.

*Dairyland Equip. Leasing*, 94 Wis. 2d at 607 (quoting *Fed. Deposit Ins. Corp.*, 76 Wis. 2d at 156). Despite the rule's complexity and criticisms, *see, e.g., Fed. Deposit Ins. Corp.*, 76 Wis. 2d at 156, its purpose remains sound: to promote the integrity, reliability, and predictability of written contracts and to reduce the threat of juries being misled or confused by statements or negotiations that may have taken place before a contract was entered into.

 

¶ 37. As our definition makes apparent, "[t]he real question when a party invokes the parol evidence rule" is whether the parties intended the written contract to be the final and complete expression of their agreement. *Id.* at 157. A contract that represents the final and complete expression of the parties' agreement is considered fully "integrated." If the contract is integrated, absent the existence of fraud, duress, or mutual mistake, the court construing the contract may not consider evidence of any prior or contemporaneous oral or written agreement between the parties.[3] If the contract is not integrated, then the parol evidence rule is inapplicable.

---

[3] We recognize a limited exception to the parol evidence rule for contemporaneous or prior agreements that supplement, but do not conflict with, the contract. *See Dairyland Equip. Leasing, Inc. v. Bohen*, 94 Wis. 2d 600, 607–08, 288 N.W.2d 852 (1980). In such cases, the contract is considered "partially integrated." *Id.* at 607. If the contract is shown to be only a partial integration of the parties' overall agreement, the court may properly consider parol evidence to establish the parties'

¶ 38. Relevant to this case, the parol evidence rule does not preclude the court from considering evidence of any prior or contemporaneous understandings or agreements between the parties for the purpose of determining whether the parties intended the contract to be integrated. Our courts often refer to this rule by stating that " '[p]arol evidence is always admissible with respect to the issue of integration.' " *See, e.g., Dairyland Equip. Leasing*, 94 Wis. 2d at 608 (quoting *Fed. Deposit Ins. Corp.*, 76 Wis. 2d at 158). However, to be precise, such evidence is not "parol evidence" at all.[4] Rather, we are merely invoking an already recognized and well-defined rule of contract law: when a contract is ambiguous, a court may consider extrinsic evidence to resolve the parties' intent. *See Stevens Constr. Corp. v. Carolina Corp.*, 63 Wis. 2d 342, 354, 217 N.W.2d 291 (1974)

full agreement, so long as the parol evidence does not conflict with the part of the contract that has been integrated. *Id.* at 607–08.

[4] *See* 6 Arthur Linton Corbin, *Corbin on Contracts* § 573, at 73–75 (interim ed. 2002):

> The use of such a name for this [parol evidence] rule has had unfortunate consequences, principally by distracting the attention from the real issues that are involved. These issues may be any one or more of the following: (1) Have the parties made a contract? (2) Is that contract void or voidable because of illegality, fraud, mistake, or any other reason? (3) Did the parties assent to a particular writing as the complete and accurate 'integration' of that contract?
>
> In determining these issues, or any one of them, there is no 'parol evidence rule' to be applied. On these issues, no relevant evidence, whether parol or otherwise, is excluded.

(Footnotes omitted.)

("While 'parol evidence'—the circumstances surrounding the execution of the contract and the practical construction of the parties—may not be introduced to vary the terms of a written contract, it may be introduced to explain ambiguous terms of the written instrument."); *Chmill v. Friendly Ford-Mercury of Janesville, Inc.*, 154 Wis. 2d 407, 416, 453 N.W.2d 197 (Ct. App. 1990) ("A court may look to extrinsic evidence to determine whether a document was intended to incorporate the entire understanding between the parties to it . . . ."). If and once it is determined that the parties intended the contract to be integrated, only then does the parol evidence rule go into effect. *See Dairyland Equip. Leasing*, 94 Wis. 2d at 607 (" '[E]ven if, without objection, parol evidence of the intention of the parties to a written contract, which conflicts with the express provisions of such contract, gets into the record, the court must disregard it." (quoting *Morn v. Schalk*, 14 Wis. 2d 307, 315, 111 N.W.2d 80 (1961))).

¶ 39. However, as Town Bank accurately points out, when the contract contains an unambiguous merger or integration clause, the court is barred from considering evidence of any prior or contemporaneous understandings or agreements between the parties, even as to the issue of integration. *See Dairyland Equip. Leasing*, 94 Wis. 2d at 608; *Matthew*, 54 Wis. 2d at 341–42. Again, this principle stems from basic contract law: if the contract is unambiguous, the court's attempt to determine the parties' intent ends with the language of the contract, without resort to extrinsic evidence. *See Huml*, 293 Wis. 2d 169, ¶ 52. In *Dairyland Equip. Leasing*, this court defined a merger clause as a "written provision which expressly negatives collateral or antecedent understandings." 94 Wis. 2d at

360

608. Thus, by definition, an unambiguous merger or integration clause demonstrates that the parties intended the contract to be a final and complete expression of their agreement. *See id.*; *Matthew*, 54 Wis. 2d at 341–42. The contract is therefore fully integrated, and the parol evidence rule goes into effect.

¶ 40. We now turn to the facts of this case. We conclude that the TCA is an unambiguous, fully integrated agreement with which Town Bank fully complied. Accordingly, Town Bank should have been granted summary judgment, and the case should not have proceeded to a jury trial.

¶ 41. We agree with Town Bank that section 14 of the TCA constitutes an unambiguous merger clause which should have precluded City Real Estate from introducing any evidence of prior understandings or agreements that may have existed between the parties, including the commitment letter.

¶ 42. Section 14 provides:

> This Agreement, including the Exhibits attached or referring to it, the Note and the Security Documents, are intended by Customer and Lender as a final expression of their agreement and as a complete and exclusive statement of its terms, there being no conditions to the full effectiveness of their agreement except as set forth in this Agreement, the Note and the Security Documents.

¶ ■

¶ 43. We conclude that section 14 unambiguously demonstrates the parties' intent to exclude additional understandings or agreements not contained in the TCA. *See Dairyland Equip. Leasing*, 94 Wis. 2d at 608. Section 14 "expressly negatives collateral or antecedent understandings," *see id.*, by delineating an exhaustive list of the documents that are included in the parties'

agreement: "This Agreement" (meaning the TCA), "the Exhibits" to the TCA, "the Note," and "the Security Documents." Pursuant to the plain language of section 14, Town Bank and City Real Estate intended that list of documents to comprise the "final expression of their agreement" and the "complete and exclusive statement of its terms." Hence, the parties intended to exclude from their final agreement any understanding or agreement not contained within the TCA, the exhibits, the Business Note, and the security documents.

¶ 44. Significantly, the language of section 14 exhibits different capitalization to denote "this Agreement," meaning the TCA itself, and "their *agreement*," meaning the parties' agreement altogether. (Emphasis added.) When referring to the parties' "final expression of *their agreement* and [] a complete and exclusive statement of *its* terms," the parties carefully utilized a lowercase "a" so as not to confuse their overall agreement with the TCA itself. (Emphasis added.) We therefore disagree with City Real Estate that it is not clear whether the parties intended the TCA to be the final expression of only the TCA itself, or whether the parties intended the TCA to be the final expression of the parties' financing agreement altogether.

¶ 45. Neither the TCA, nor the exhibits to the TCA, nor the Business Note, nor the security documents mention the commitment letter or reference financing in two phases. To the contrary, the Business Note provides for a single sum of $2,500,000, the very amount that Town Bank loaned to City Real Estate on July 15, 2004. If City Real Estate wanted the terms of the commitment letter, or a second phase of financing, to be included in the TCA, City Real Estate was free to so negotiate.

362

¶ 46. Citing our decision in *Dairyland Equip. Leasing*, City Real Estate argues that in order for the TCA to have unambiguously excluded the terms of the commitment letter, the TCA had to "expressly negative[]" the commitment letter or the two-phase nature of the financing. *See* 94 Wis. 2d at 608. City Real Estate's interpretation of our case law necessarily implies that hereinafter, lenders—or all contract drafters, for that matter—would be obligated to expressly identify and exclude in their contracts any prior oral or written communication between the parties that may rise to the level of an agreement, lest risk its inclusion within the contract. We refuse to impose such an unnecessary and cumbersome burden on contract drafters.

¶ 47. We further reject City Real Estate's arguments that the TCA is otherwise ambiguous. First, City Real Estate argues that an ambiguity arises out of the fact that the parties checked the box for "Multiple Notes; Multiple Advances." The argument is difficult to follow. According to City Real Estate, the checking of that box created an obligation for multiple notes. Because the section on "Multiple Notes; Multiple Advances" also states that the TCA "does not constitute a commitment by Lender to make such extensions of credit," City Real Estate contends that the TCA implies that some other document created the obligation for multiple notes. Therefore, City Real Estate argues, a genuine issue of material fact existed as to whether the commitment letter created the obligation for multiple notes.

¶ 48. We disagree. The section on "Multiple Notes; Multiple Advances" is clear. It plainly recognizes that Town Bank may make additional extensions of credit to City Real Estate "from time to time," and if such loans occur, the parties "agree that sections 4 through 19 of

363

[the TCA] shall apply to each such extension of credit." Significantly, the provision then expressly states that the TCA "does not constitute a commitment by [Town Bank] to make such extensions of credit to [City Real Estate]." Hence, while Town Bank has the option, the TCA does not obligate Town Bank to make any additional extensions of credit to City Real Estate.

¶ 49. Second, relying on *Stevens Constr. Corp.*, City Real Estate argues that the TCA is latently ambiguous, and therefore, the circuit court properly considered parol evidence to clarify the ambiguity. *See* 63 Wis. 2d at 354–55. A contract, though clear on its face, may be considered latently ambiguous if its application produces absurd or unreasonable results that the parties could not have intended. *See id.* at 354. City Real Estate contends that the TCA is latently ambiguous when applied to the context of the Wisconsin Tower project. According to City Real Estate, while an "uninformed observer" could view the TCA as a final expression of the parties' universal agreement, a latent ambiguity arises "as soon as the observer learns that the parties had in place a [c]ommitment [letter] providing for two phases of financing necessary for the project, and that the TCA only provides for one of those phases . . . ."

¶ 50. City Real Estate's argument ignores the presence of the TCA's unambiguous merger clause. As previously explained, because section 14 of the TCA constitutes an unambiguous merger clause, the court is precluded from considering any prior understanding or agreement that may have existed between Town Bank and City Real Estate, including the commitment letter. Thus, by its very nature, the unambiguous merger

clause bars the court from considering the TCA within the context of the commitment letter.

¶ 51. Because we conclude that the TCA constitutes an unambiguous, fully integrated agreement, our attempt to determine the parties' intent ends with the four corners of the TCA, without resort to extrinsic evidence. *See Huml*, 293 Wis. 2d 169, ¶ 52. Such extrinsic evidence includes, but is not limited to, the commitment letter and various credit memoranda prepared by Town Bank that referenced a two-phase financing arrangement. Pursuant to the TCA, Town Bank was obligated to loan $2,500,000 to City Real Estate. Town Bank fully complied. Therefore, Town Bank should have been granted summary judgment, and the case should not have proceeded to a jury trial.

¶ 52. Even assuming, without deciding, that the commitment letter constitutes a separate and enforceable contract for financing,[5] Town Bank was within its rights to terminate the agreement and therefore was still entitled to summary judgment. It is undisputed that City Real Estate did not fulfill at least two of the conditions set forth in the commitment letter: the requirement that a credit agreement be executed by

---

[5] Deciding that the commitment letter constitutes an enforceable contract could result in unforeseen consequences. Assuming that the commitment letter constitutes an enforceable contract, the contract binds and is enforceable against both parties: the lender and the borrower. *See Levin v. Perkins*, 12 Wis. 2d 398, 403, 107 N.W.2d 492 (1961). Suppose that after a commitment letter has been executed, the borrower secures a better financing arrangement with a different lender. If the commitment letter constitutes an enforceable contract, the original lender could enforce the commitment letter against the borrower and seek damages for, *inter alia*, lost interest.

June 25, 2004, and the obligation to contribute $900,000 in up-front equity.

¶ 53. First, it is undisputed that a credit agreement between Town Bank and City Real Estate was not executed by June 25, 2004, as required by the commitment letter. The commitment letter expressly provides that "[t]his commitment may be terminated at the sole option of Town Bank if the credit agreement is not executed by June 25, 2004." There is no question that the TCA, the only credit agreement between Town Bank and City Real Estate, was not executed until July 15, 2004. Because the credit agreement was not timely executed, Town Bank was well within its rights to terminate the commitment letter.

¶ 54. Second, it is undisputed that City Real Estate did not fulfill its obligation to contribute $900,000 in up-front equity. The commitment letter provides that the "[c]losing of [the] loan is contingent upon but not limited to the following: . . . B. Borrower agrees to contribute $900,000 in up front equity capital prior to closing." City Real Estate does not dispute that it never infused $900,000 of equity into the Wisconsin Tower project. Instead, City Real Estate complains that Town Bank never demanded the money: "[City Real Estate] w[as] ready, willing, and able to [satisfy the up-front equity condition] upon demand once the project progressed to the point of requiring draws upon the Phase II construction financing to build pre-sold condominiums." City Real Estate's defense falls short in two respects. First, Town Bank did not have to demand the $900,000 from City Real Estate; the contingency outlined in the commitment letter functioned as the demand. Second, the commitment letter required City

Real Estate to contribute $900,000 in equity "prior to closing," well before the project progressed to the construction phase.

¶ 55. Because it is undisputed that City Real Estate failed to comply with at least two of the conditions set forth in the commitment letter, Town Bank was under no obligation to provide financing thereunder.

## V. CONCLUSION

¶ 56. We conclude that the TCA is an unambiguous, fully integrated agreement with which Town Bank fully complied. Accordingly, Town Bank should have been granted summary judgment, and the case should not have proceeded to a jury trial. We agree with Town Bank that the TCA contains an unambiguous merger clause which precluded City Real Estate from introducing any evidence of prior understandings or agreements that may have existed between the parties, including the commitment letter. Even assuming, without deciding, that the commitment letter constitutes a separate and enforceable contract for financing, we conclude that Town Bank was within its rights to terminate the agreement. It is undisputed that City Real Estate did not fulfill at least two of the conditions set forth in the commitment letter.

*By the Court.*—The decision of the court of appeals is affirmed.

¶ 57. ANN WALSH BRADLEY, J. (*dissenting*). I agree with the Wisconsin Bankers Association and the court of appeals that "this case does not involve one agreement superseding another. It involves two separate, independent agreements that do not in any way involve each other."

¶ 58. I also agree with the Wisconsin Bankers Association and the court of appeals that "the TCA is a stand-alone agreement . . . [that] must be interpreted on its terms with respect to the [$2.5 million loan], and the Commitment must be interpreted separately on its terms with respect to the proposed financing addressed in the Commitment."

¶ 59. The majority, however, disagrees. Rather than treating the TCA and the Commitment as two separate contracts which must be interpreted independently, it interprets the TCA as the final agreement with an integration clause that replaces the separate Commitment agreement. In fact, the majority warns that treating the two agreements as separate could have "unforeseen consequences." Majority op., ¶ 52 n.5.

¶ 60. In this regard, I conclude that the analysis of the Wisconsin Bankers Association and the court of appeals is more persuasive and should be controlling. It is, I fear, the approach of the majority that has the potential to yield "unforeseen consequences" for the day-to-day practices of the banking industry. Because the majority's analysis introduces uncertainty in the lending process and creates uncertainty in well-established law, I respectfully dissent.

I

¶ 61. The majority accurately sets forth the question before the court: whether Town Bank has a obligation to lend $6.5 million in Phase II financing under the terms of the Commitment. *See* majority op., ¶¶ 21–22.[1] In answering this question, however, the majority does not focus on the terms of the Commit-

---

[1] The majority explains that Town Bank sought "a declaratory judgment that City Real Estate failed to satisfy its

368

ment. Rather, its focus shifts to the terms of the Term Credit Agreement (TCA), and specifically, to the TCA's "Entire Agreement" clause. *See id.*, ¶ 40 ("[T]he TCA is an unambiguous, fully integrated agreement with which Town Bank fully complied.").

¶ 62. The majority concludes that the TCA's "Entire Agreement" clause evinces the parties' intent to "exclude from their final agreement any understanding or agreement not contained within the TCA, the exhibits, the Business Note, and the security documents." *Id.*, ¶ 43. It determines that whenever a contract "contains an unambiguous merger or integration clause, the court is barred from considering evidence of any prior or contemporaneous understandings or agreements between the parties, even as to the issue of integration." *Id.*, ¶ 39.

¶ 63. Thus, although City Real Estate seeks to enforce the Commitment, the majority determines that the Commitment may not be considered by a court due to the terms of the TCA. The implication of this analysis is that any written contract with an unambiguous integration clause necessarily supersedes all existing agreements between the parties, unless the integration clause specifically references an existing agreement. Under the majority's analysis, the TCA and the Commitment are intertwined—the parties do not have any obligations under the Commitment because the Commitment was superseded by the TCA, as evinced by the TCA's integration clause.

obligations under the commitment letter" and that "City Real Estate counterclaimed for damages arising out of Town Bank's alleged breach of the commitment letter." Majority op., ¶¶ 21–22.

¶ 64. The majority's conclusion that an unambiguous integration clause replaces any existing agreement not specifically referenced is directly contrary to the position advocated by the Wisconsin Bankers Association.[2] The Wisconsin Bankers Association contends that "this case does not involve one agreement superseding another," and that the TCA and the Commitment are "separate, independent agreements that do not in any way involve each other."[3]

¶ 65. The Wisconsin Bankers Association repeatedly argues that the TCA and the Commitment are independent agreements that must be interpreted separately.[4] Its concern is that City Real Estate attempts to read the terms of the Commitment into the TCA: "[Our] only concern is that the borrower should not be able to find support for its argument that Town Bank breached

[2] When we accepted review of this case, the Wisconsin Bankers Association requested permission to file an amicus brief. It explained that the appeal presented issues "of particular interest to the" Wisconsin Bankers Association because "[t]he Term Credit Agreement utilized by the parties is a form sold by a [Wisconsin Bankers Association] subsidiary to lenders in the state" and "[h]undreds of lenders and thousands of term credit lending arrangements are entered into using this form." Motion of Wisconsin Bankers Association for Leave to File Brief as Amicus Curiae ¶¶ 2–3.

[3] Brief of the Wisconsin Bankers Association as Amicus Curiae at 8.

[4] The Wisconsin Bankers Association explains that Town Bank entered into a separate TCA with City Real Estate to make the $2.5 million loan. "Whether or not City fulfilled [the conditions set forth in the Commitment] and is entitled to damages for Bank's failure to lend is a question of interpretation of the Commitment." *Id.* at 4.

its obligations under the Commitment by somehow reading the terms of the Commitment into the completely independent Term Credit Agreement."[5] It argues that the effect of the TCA's unambiguous integration clause is to put both parties on notice "that any other agreement that might be out there, whatever it may be, is not part of" the TCA.[6]

¶ 66. To this end, the Wisconsin Bankers Association contends: "The Term Credit Agreement stands on its own. The Commitment stands on its own."[7] It asserts that "[t]he TCA must be interpreted on its terms with respect to the [$2.5 million loan], and the Commitment must be interpreted separately on its terms with respect to the proposed financing addressed in the Commitment."[8] According to the Wisconsin Bankers Association, the terms of the TCA are not relevant when interpreting the Commitment: "Whether or not City fulfilled [the Commitment's] conditions and is entitled to damages for the Bank's failure to lend is a question of interpretation of the Commitment."[9]

---

[5] Motion of Wisconsin Bankers Association for Leave to File Brief as Amicus Curiae ¶ 5. At various times throughout this litigation, City Real Estate appeared to argue that the TCA's "multiple notes" clause supported its contention that the Commitment was a binding contract. The Bankers Association objected to City Real Estate's attempt to bootstrap its claim for damages under the Commitment to the "multiple notes" clause in the TCA.

[6] *Id.*, ¶ 6.

[7] *Id.*, ¶ 5.

[8] Brief of the Wisconsin Bankers Association as Amicus Curiae at 8.

[9] *Id.* at 4. When it filed its motion for leave to file an amicus brief, the Wisconsin Bankers Association asserted that it had "no opinion on whether or not the Commitment was repudiated

¶ 67. The majority's conclusion that the court is barred from considering the Commitment due to the TCA's integration clause is incompatible with the Wisconsin Bankers Association's assertion that the TCA and the Commitment are "separate, independent agreements that do not in any way involve each other." This conclusion introduces uncertainty in contractual relationships far beyond the contours of this case.

¶ 68. As explained by the Wisconsin Bankers Association, the situation presented in this case is "quite common throughout the state."[10] At any given time, there may exist a number of separate, independent agreements between a borrower and a bank:

> Banks often have a variety of outstanding loans to individuals and their related interests, as well as agreements for other banking services with those parties. A bank could have several loans to a borrower, could be negotiating the refinancing of some of those loans, and at the same time could be negotiating different commitments for upcoming projects.[11]

¶ 69. The majority's determination that a written contract containing an unambiguous integration clause replaces all existing agreements between the parties may yield undesirable and unforeseen consequences. Parties may find that by signing a form agreement, they have put into question the enforceability of any other

by the borrower's failure to fulfill conditions precedent to the construction loan." Motion of Wisconsin Bankers Association for Leave to File Brief as Amicus Curiae ¶ 5.

[10] Motion of Wisconsin Bankers Association for Leave to File Brief as Amicus Curiae ¶ 3; *see also* Brief of the Wisconsin Bankers Association as Amicus Curiae at 1.

[11] Brief of the Wisconsin Bankers Association as Amicus Curiae at 9.

outstanding agreements between them—without having intended to do so.[12] Before drafting a new contract, must a loan officer now review all other existing agreements and enumerate them in the new contract to ensure that the new contract does not inadvertently supersede those existing agreements?

¶ 70. The Wisconsin Bankers Association called City Real Estate's interpretation of the integration clause "radical," "absurd," and "impractical" because it would require the parties to "expressly negative" any other existing agreements: "City is requesting a radi-

[12] Imagine the following hypothetical, based on the facts of this case. Town Bank and City Real Estate execute a term credit agreement ("TCA I") for $2.5 million in Phase I financing. Several months later, Town Bank agrees to go ahead with Phase II financing. Town Bank and City Real Estate execute a second term credit agreement ("TCA II") for a $6.5 million loan.

TCA II contains an "Entire Agreement" clause which provides as follows:

> This Agreement, including the Exhibits attached or referring to it, the Note [for $6.5 million] and the Security Documents, are intended by Customer and Lender as a final expression of their agreement and as a complete and exclusive statement of its terms, there being no conditions to the full effectiveness of their agreement except as set forth in this Agreement, the Note and the Security Documents. TCA II, the Note, and the Security Documents make no reference to TCA I or the terms of the $2.5 million Phase I loan.

Imagine that City Real Estate defaults on its obligations under TCA I, and Town Bank files suit to enforce its terms. Could City Real Estate argue that that TCA I was no longer enforceable because it had been superseded by TCA II? According to the majority's analysis in this case, such an argument may be viable—TCA II "contains an unambiguous [] integration clause, [therefore] the court is barred from considering evidence of [TCA I, which is a] prior [] agreement[] between the parties." *See* majority op., ¶ 39.

cal new interpretation of integration clauses. It wants this Court to require the integration clause to 'expressly negative' the Commitment in order to have the terms of the Commitment excluded from the terms of the [TCA]. . . . This is an absurd and very impractical request."[13]

¶ 71. Yet, the majority's conclusion is the mirror image of City Real Estate's request, and it leads to the same absurd and impractical result. Rather than requiring drafters to "expressly negative" any existing agreements, the majority requires drafters to "expressly affirm" their existing agreements if they wish to prevent those agreements from being superseded.

¶ 72. Such a requirement may create traps for the unwary. Signing a contract with an unambiguous integration clause does not necessarily evince an intent to supersede all existing agreements. Parties sign contracts all the time without thinking it necessary to enumerate (and thereby preserve) any existing agreements between them.

¶ 73. Nevertheless, this requirement is driven by the majority's analysis. Its decision may "result in completely unnecessary effort on the part of parties when drafting a contract, and build into contracts the very ambiguity and uncertainty the parol evidence rule is intended to remove."[14]

### III

¶ 74. The majority's analysis is flawed not only because it introduces uncertainty into the lending process, but also because it creates uncertainty in what has

[13] Brief of the Wisconsin Bankers Association as Amicus Curiae at 7.

[14] *Id.* at 2.

been the well-established law. We have repeatedly explained that "[p]arol evidence is always admissible with respect to the issue of integration[.]"[15] The reason underlying this rule is that a court cannot determine from the four corners of a contract whether the parties intended it to be a complete integration, a partial integration, or no integration whatsoever. "[A] writing cannot of itself prove its own completeness[.]" Restatement (Second) of Contracts § 210 cmt. b (1981); *see also id.* § 214 cmt. a.

¶ 75. On one hand, the majority embraces this time-honored rule, while on the other hand it embraces an opposite or a different rule. Unfortunately, the majority's inconsistency is demonstrated not only from paragraph to paragraph, but also the inconsistency exists within the very same paragraph.

¶ 76. Citing several cases, the majority sets forth the time-honored rule: "the parol evidence rule does not preclude the court from considering evidence of any prior or contemporaneous understandings or agreements between the parties for the purpose of determining whether the parties intended the contract to be integrated. Our courts often refer to this rule by stating that 'parol evidence is *always admissible* with respect to the issue of integration.'" Majority op., ¶ 38 (emphasis added).

¶ 77. In the very same paragraph the majority appears to embrace the exact opposite of the rule, i.e.,

---

[15] *Dairyland Equip. Leasing v. Bohen*, 94 Wis. 2d 600, 608, 288 N.W.2d 852 (1980); *Fed. Deposit Ins. Corp. v. First Mortg. Investors*, 76 Wis. 2d 151, 158, 250 N.W.2d 362 (1977); *Johnson Hill's Press v. Nasco Indus.*, 33 Wis. 2d 545, 550, 148 N.W.2d 9 (1967); *Brevig v. Webster*, 88 Wis. 2d 165, 173, 277 N.W.2d 321 (Ct. App. 1979); *see also Scarne's Challenge, Inc. v. M.D. Orum Co.*, 267 Wis. 134, 64 N.W.2d 836 (1954).

that parol evidence is *never admissible* with respect to. the issue of integration. It appears to assert that the rule comes into play only after the issue of integration has already been determined: "If and once it is determined that the parties intended the contract to be integrated, only then does the parol evidence rule go into effect." *Id.*

¶ 78. The first sentence of the following paragraph sets forth yet a different rule. Rather than being *always admissible* on the issue of integration, it is only *sometimes admissible*, i.e. admissible when there is an integration clause that is ambiguous. The majority states: "[W]hen the contract contains an unambiguous merger or integration clause, the court is barred from considering evidence of any prior or contemporaneous understandings or agreements between the parties, even as to the issue of integration." *Id.*, ¶ 39.

¶ 79. So what is the rule? Is it the time-honored rule that the majority purports to embrace—that parol evidence is *always admissible* with respect to the issue of integration? Is it *never admissible* on the issue of integration? Or is it *only sometimes admissible* on the issue of integration when an integration clause is ambiguous? The majority gets tangled up in its analysis because it conflates the general rules of contract interpretation with the specific rule of parol evidence associated with the interpretation of an integration clause.[16]

IV

¶ 80. When I examine this case, I apply the time-honored rule that parol evidence is always admissible

---

[16] For a discussion of the dangers of conflating principles of contract interpretation with the parol evidence rule, see Margaret N. Kniffin, *Conflating and Confusing Contract Interpretation and the Parol Evidence Rule: Is the Emperor Wearing Someone Else's Clothes?*, 62 Rutgers L. Rev 75 (2009–2010).

with respect to the issue of integration. Like the Wisconsin Bankers Association and the court of appeals, I conclude that the Commitment is a separate agreement from the TCA and it must be interpreted according to its terms.

¶ 81. The question of whether City Real Estate repudiated the Commitment by failing to satisfy its conditions precedent presented questions of fact which were decided by the jury. After hearing some evidence that City Real Estate failed to fulfill the Commitment's conditions, the jury nevertheless determined that under these circumstances, it was Town Bank that breached the Commitment. An appellate court will sustain a jury verdict if there is any credible evidence to support it. *Hoffman v. Wisconsin Elec. Power Co.*, 2003 WI 64, ¶ 9, 262 Wis. 2d 264, 664 N.W.2d 55. Here, there is credible evidence in the record to support the jury's verdict.

¶ 82. Because the majority's analysis is incompatible with and less persuasive than the analysis advanced by the Wisconsin Bankers Association, because it may introduce uncertainty in contractual relationships far beyond the contours of this case, and because it creates uncertainty in what has been the well-established law, I respectfully dissent.

¶ 83. I am authorized to state that Chief Justice SHIRLEY S. ABRAHAMSON joins this dissent.