In the

# United States Court of Appeals

## For the Seventh Circuit

No. 12-1208

WELLS FARGO BUSINESS CREDIT,

*Plaintiff-Appellee*,

*v.*

DONALD J. HINDMAN,

*Defendant-Appellant*.

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 2:10-cv-00348-RTR — **Rudolph T. Randa**, *Judge*.

ARGUED SEPTEMBER 5, 2012 — DECIDED OCTOBER 30, 2013

Before BAUER, MANION, and TINDER, *Circuit Judges*.

TINDER, *Circuit Judge*. Wells Fargo Business Credit sued Donald J. Hindman under diversity jurisdiction for breach of contract. Wells Fargo and Hindman were both creditors of Clark National, Inc., whose president and CEO was Hindman's son, and several related companies. Wells Fargo agreed to make loans and extend credit to the companies only if Hindman agreed to become a subordinated creditor. Hindman agreed and subsequently executed a series of sub-

ordination agreements with Wells Fargo, which subordinated all present and future debts, liabilities, and obligations that the companies owed to Hindman to any amounts they owed to Wells Fargo.

In January 2010, a series of events occurred resulting in Hindman authorizing a wire transfer of $750,000 from his personal investment account at Wells Fargo to Clark at the request of his son. By that time, however, his son purportedly had been stripped of the authority to make business decisions by Clark's board of directors. When the authorized decision makers learned about the purported loan, they ordered Hindman's son to reject the funds. Hindman's son promptly instructed the Wells Fargo Bank vice-president in charge of Hindman's personal investment account to stop the transaction. For reasons that are not clear, the transaction was not stopped before the $750,000 hit Clark's accounts and was automatically used to pay down its Wells Fargo line of credit. A few days later, however, the same Wells Fargo Bank vice-president who had attempted to stop the transaction transferred $750,000 from Clark's account to Hindman's account at a bank in Florida at Hindman's request.

Wells Fargo claims that Hindman's receipt of the $750,000 constitutes a clear violation of the subordination agreements because Clark repaid a debt to Hindman while it had outstanding obligations to Wells Fargo. Hindman, on the other hand, maintains that a valid loan was never consummated between him and Clark because his son had been stripped of authority to make business decisions and thus could not bind the company. Furthermore, the authorized decision makers rejected the proposed loan once they learned about it; that is, there was never an authorized ac-

ceptance, and so a valid loan contract never existed. Wells Fargo ignores most of Hindman's arguments and maintains that the transfer of funds completed the loan because Hindman's son had signed a subordinated debenture and Clark used the funds to pay down its line of credit and take subsequent cash advances. Hindman responds that even if a valid loan existed, he did not breach the subordination agreements, either because the loan was properly rescinded by the parties thereto, or because Wells Fargo consented to return of the funds. Wells Fargo says that rescission of the loan agreement would place Hindman in breach of the subordination agreements unless it had given proper consent, and it argues that the vice-president who returned the money to Hindman lacked authority to give consent under the subordination agreements.

The district court granted Wells Fargo's motion for summary judgment and denied Hindman's cross-motion. It rejected Hindman's arguments concerning rejection and rescission as irrelevant. The court reasoned that Hindman's transfer of $750,000 to Clark created a debt, liability, or obligation and that returning the funds to Hindman before Wells Fargo had been paid in full constituted a breach of the subordination agreements because Wells Fargo had not consented. This was the extent of the court's reasoning. It did not explain why Hindman's arguments were irrelevant, and it did not acknowledge the dispute over the issue of consent. The court subsequently awarded damages of $750,000 plus interest to Wells Fargo, which Hindman also challenges.

We vacate the judgment and remand for further proceedings. The arguments raised by Hindman in the district court and on appeal are not baseless and should have been ad-

dressed by both the district court and Wells Fargo. By failing to address Hindman's plausible arguments, Wells Fargo has failed to carry its burden in showing that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56. It may well turn out that Hindman's facially plausible arguments are not persuasive, but based on this record and Wells Fargo's seeming refusal to acknowledge those arguments, we cannot make that determination without performing Wells Fargo's tasks for it, which we will not do.

## I.   Background

Hindman owned and operated Clark and three related companies (collectively, "Borrowers") for a number of years. When Hindman retired around 2005, his son Donald D. Hindman ("D.D.H.") assumed control of the family businesses and became president and CEO of Clark. While Hindman ceased participating in day-to-day operations, he remained involved by routinely making loans to Borrowers to initiate capital-raising campaigns and by serving as chairman of Clark's board of directors. (Appellant's Separate App. 51; Appellee's Supp. App. 46.)

Wells Fargo Business Credit is a secured lender that loaned money and extended credit to Borrowers. The business line of credit provided funds as working capital to cover expenses while incoming accounts receivable were pending. The amount of advances Borrowers could take on their line of credit depended on the accounts receivable and inventory they reported on their daily collateral reports. Wells Fargo closely monitored those reports and adjusted Borrowers' line of credit accordingly. All incoming cash (including loans) was reported on the daily collateral report and depos-

ited into a cash-collateral account held by Wells Fargo for Borrowers' benefit. Wells Fargo used the incoming funds to pay down Borrowers' line of credit, which created available credit on which Borrowers could take additional advances. All advances approved by Wells Fargo then would be deposited into Borrowers' master-funding account. (Appellee's Supp. App. 68–69.)

Before agreeing to provide this line of credit, Wells Fargo required that any debts Borrowers owed or would owe to Hindman be subordinated to ensure that Wells Fargo would get paid before he would. Accordingly, Wells Fargo and Hindman entered into a series of subordination agreements under which Hindman became a subordinated creditor. There were three largely identical subordination agreements in total. (Appellant's Separate App. 1–7; Appellee's Supp. App. 1–8, 27–33, 36–42.) As Wells Fargo alleges breach of all three, and none of the parties' arguments rely on any differences in the wording of the agreements, we simply refer to them as the subordination agreements.

The subordination agreements subordinated payment of "Subordinated Indebtedness" to payment in full of Borrowers' indebtedness to Wells Fargo, and that term is defined in relevant part as "each and every … debt, liability and obligation of every type and description which any Borrower may now or at any time hereafter owe to [Hindman], whether such debt, liability or obligation now exists or is hereafter created or incurred." (Appellant's Separate App. 2.) Hindman agreed that he would not, absent Wells Fargo's prior written consent, "demand, receive or accept any payment (whether of principal, interest or otherwise)" from Borrowers until their indebtedness to Wells Fargo had been paid in

full and Wells Fargo had released its lien on any collateral (subject to a few narrow exceptions not relevant here). (*Id.* at 3.) In the event Hindman received an unauthorized payment, the subordination agreements provided that he would "hold the amount so received in trust for [Wells Fargo] and [would] forthwith turn over such payment to [Wells Fargo]." (*Id.*)

Toward the end of 2009, D.D.H. informed Wells Fargo in face-to-face meetings that Clark needed additional capital and that a majority of this capital would likely come from Hindman. To protect Wells Fargo's status as senior creditor, its representatives discussed with D.D.H. a form of subordinated debenture that would be used for all future subordinated loans. (Appellee's Supp. App. 47, 51.)

On January 6, 2010, Hindman emailed Tom Bassett, a vice-president of Wells Fargo Bank (not Business Credit) who handled Hindman's personal investment account, instructing Bassett to go ahead and sell some of Hindman's stock to provide $1 million in working capital for Clark and requesting that it be done promptly. (Appellant's Separate App. 27.) On January 7, D.D.H. emailed Bassett instructing him to hold the funds from the sale of equities in Hindman's account until D.D.H. provided wiring instructions, which D.D.H. expected to do the following day. (*Id.* at 49.)

On January 8, Clark's board of directors held a meeting. It is unclear from the record how many directors Clark had, but the minutes reflect that a quorum was present, consisting of the following three directors: Hindman, D.D.H., and Robert Early. Hindman served as chairman and D.D.H. served as secretary. Also in attendance were Clark CFO Mark Bruno; Kevin Cleary, a member of Clark's board of

advisors and the president of Dearborn Partners, which had been retained by Clark to provide financial advisory services; and T.D. Decker, Clark's full-time turn-around consultant and financial advisor. (*Id.* at 51.) At this meeting, the board agreed to Cleary's suggestion that D.D.H. "would step aside from corporate decision-making and focus on new sales, preserving existing customer relationships and assisting, as needed, in the sales of assets." (*Id.* at 52.) At the same time, the board agreed that Decker and CFO Bruno "would be responsible for all corporate business decisions and would operate [Clark] in the best interests of the creditors." (*Id.* at 52.) Also during this meeting, Hindman discussed the possibility of loaning another $750,000 to Clark, but no commitment was made. (*Id.* at 13, 19, 52.)

Shortly before the board meeting, Cleary had expressed his opinion that Clark required at least $3 million in new capital to continue operating. (*Id.* at 13, 50.) By January 14, it had become clear to Early that even $3 million would be insufficient. (*Id.* at 22.) Given the dire straits Clark was in, Bruno was of the view that a $750,000 loan from Hindman to Clark would not be prudent because Hindman would simply be throwing away his money. (*Id.* at 19.)

Shortly after noon on January 12, Bassett emailed D.D.H. to inform him that Bassett was ready to make a transfer out of Hindman's investment account and into Clark's account. (*Id.* at 27, 46.) A few minutes later, D.D.H. wrote back that he was trying to obtain Wells Fargo Business Credit's approval for the funds to come in as secured. (*Id.* at 28, 46.) Soon thereafter, D.D.H. spoke on the phone with Kathryn D. Williams, a vice-president of Wells Fargo Business Credit who was primarily responsible for the business-lending relation-

ship with Clark, about the loan Hindman was going to make. (*Id.* at 46; Appellee's Supp. App. 57.) At 1:04 p.m., Williams requested a copy of the note so that she could prepare a subordinated debt agreement. (Appellee's Supp. App. 57.) At 1:46 p.m., D.D.H. sent Williams an email with a copy of the note attached. (*Id.* at 58.) Bruno, Decker, and Cleary were copied on the email. (*Id.*) At 2:49 p.m., Decker sent D.D.H. an email that read: "After discussions …, [Cleary] thinks we should talk with you about the timing of receiving and spending the $[7]50,000. Before we accept the funds, we should discuss." (Appellant's Separate App. 47.)

On the morning of January 13, D.D.H. called Hindman and asked him to call Bassett to release the funds from Hindman's investment account. (*Id.* at 16, 44.) Hindman made the call, and at 10:58 a.m., Bassett emailed D.D.H. to inform him that the order had been placed and would post to Clark's account that day. (*Id.* at 44.) Bruno, Decker, Cleary, and Early were not aware that D.D.H. was doing this. (*Id.* at 13, 20, 22.)

Also, at 11:55 a.m. that day, D.D.H. emailed a revision of the executed debenture to Williams. (Appellee's Supp. App. 55–56.) The debenture reflected that Hindman would loan $750,000 to Clark to be repaid by November 1, 2011. (*Id.* at 56.) D.D.H. signed the debenture as president and CEO of Clark and dated it (though dated January 12, 2009, there is no dispute that it was actually signed on January 12, 2010); Hindman did not sign it. (*Id.*)

On January 14, Maria Preston, Clark's A/R (accounts receivable) and Cash Manager, contacted Bassett and another Wells Fargo representative to tell them that the wire transfer could not be deposited into the specified account. (Appel-

lant's Separate App. 36.) Apparently, Bassett had directed the $750,000 to be credited to Clark's payroll account, when it should have been credited to either the cash-collateral or master-funding account. (*Id.* at 37, 38, 59; Appellee's Supp. App. 99.) After a series of email exchanges, on which Bruno had been copied, the funds were deposited into Clark's cash-collateral account. (Appellant's Separate App. 34–38.)

While all of this was going on, there was a conference among Cleary, D.D.H., Decker, Bruno, and Early, during which D.D.H. was directed by the others to contact Wells Fargo immediately and stop or reverse the transfer of funds. (*Id.* at 16, 20.) D.D.H. contacted Bassett and told him to stop or reverse the transaction, and D.D.H. believes that he gave this instruction before the $750,000 hit Clark's cash-collateral account. (*Id.* at 16.) But for reasons that are unknown, the transfer was neither stopped nor reversed that day, and the statement for Clark's cash-collateral account shows that $750,000 was received from Hindman on January 14. (Appellee's Supp. App. 109.)

On the morning of January 15, Maria Preston sent an email to Bassett (D.D.H. and Bruno were copied), informing him that Clark had received $750,000 the previous day but that it appeared "that the originator is trying to reverse payment." (Appellant's Separate App. 34.) A few minutes later, D.D.H. emailed the following to Bassett and Preston (Bruno and Decker were copied): "TB: Please hold the wire on your end if possible—thanks. Left you a VM." (*Id.* at 71.) Fifteen minutes later, Bassett emailed Preston (D.D.H. and Bruno were copied), saying that he was "very confused" as to what was going on: "I was told that the first $750k transfer 'suspended' because we used the incorrect account

[number]—as they were retrieving that transfer, they made a second $750k transfer to the correct account—are they trying to reverse that one, too? I have a call into those people so we can get this matter resolved—I am sorry for the confusion." (*Id.* at 33.) About two hours later, D.D.H. emailed Bassett, stating "please reverse if it hit our account." (*Id.* at 32.) Then at 1:12 p.m., Bassett responded to D.D.H. with an email, which simply read, "Done!" (*Id.* at 32.) According to Hindman's bank statement, the $750,000 was back in his account by the close of business. (*Id.* at 70.) The next day, January 16, Bruno emailed Early to inform him that the $750,000 was held back and that, as a result, Hindman had not loaned any money that week. (*Id.* at 23.)

But this fiasco was by no means over. On the same day that D.D.H. and Bassett were trying to stop or reverse the wire transfer, Wells Fargo Business Credit received Clark's daily collateral report, which had been signed by Clark's treasurer and reported $751,847.49 as non-A/R cash.[1] (Appellee's Supp. App. 64.) Accordingly, Wells Fargo used the $750,000 to pay down Clark's line of credit. (*Id.* at 127.) According to Wells Fargo, Clark used Hindman's $750,000 and other funds to draw advances totaling $3,036,089.96 between January 15 and January 21. The statement for Clark's master-funding account reflects the following advances:

---

[1] Classifying the funds as "non-A/R cash" allowed Clark to take up to 100% of the loan as additional advances. Had it been classified as "A/R cash," then Clark would have been able to take additional advances equal to 15% of the loan; this is because, with regard to pending accounts receivable, Wells Fargo would loan 85% of the invoice amount to Clark before the cash came in, with the remaining 15% available once the invoice had been paid in full. (Appellee's Supp. App. 144.)

- January 15:        $471,668.95
- January 19:        $910,793.56
- January 20:        $592,208.82
- January 21:        $1,061,418.63

(*Id.* at 132.)

Hindman's personal account statement reflects that the $750,000 that purportedly had been returned to his account on January 15 was withdrawn from his account on January 19. (Appellant's Separate App. 70.) Hindman did not authorize this. The account statement includes a note that the original transaction could not be reversed. (*Id.* at 70.) Upon discovering this, Hindman contacted Bassett and asked him to wire the funds to Hindman's account at Gibraltar Bank in Florida; Bassett did so on January 21. (Appellee's Supp. App. 139.) Thus, $750,000 of the $1,061,418.63 placed into Clark's master-funding account on January 21 was wired to Hindman's personal account at another bank.

According to Williams, after January 15, the day the funds appeared in Clark's account, she spoke with Hindman over the phone and informed him that repayment of the loan would violate the subordination agreements. She also phoned Bruno and informed him that payment from Clark to Hindman of the $750,000 would violate not only the subordination agreements but the credit and security agreement between Wells Fargo and Clark. (*Id.* at 52.) While monitoring Clark's accounts, she noticed that $750,000 had been wired to Hindman's account at Gibraltar Bank in Florida. (*Id.* at 53.) On February 2, 2010, Williams sent a letter to Hindman notifying him that Clark's payment to him on January 21 was a breach of the subordination agreements and a default

of Clark's credit and security agreement. (*Id.* at 65–66.) On April 7, Wells Fargo made a written demand to Hindman and Clark ordering that Hindman return the $750,000 to Clark; Hindman refused. (*Id.* at 48.)

Shortly after the money was returned to Hindman, Clark went belly up and began liquidating its assets. (*Id.*) As of March 25, 2011, Clark still owed Wells Fargo $7,306,098.34. (*Id.* at 49.)

On April 22, 2010, Wells Fargo filed this diversity suit in the Eastern District of Wisconsin, asserting claims of breach of contract and promissory estoppel. The parties subsequently filed cross-motions for summary judgment as to liability. On June 21, 2011, the district court issued its decision and order granting Wells Fargo's motion and denying Hindman's motion. In response to Hindman's primary contention that he never actually loaned money to Borrowers because the transaction had been rejected or rescinded, the district court concluded: "This distinction is irrelevant. It is undisputed that Hindman transferred $750,000.00 to Borrowers, which created a 'debt, liability and obligation' owed to Hindman as the Subordinated Creditor." Wells Fargo subsequently filed a motion for a determination of damages. On January 11, 2012, the district court issued its decision and order granting Wells Fargo's motion and entered judgment against Hindman in the amount of $750,000.00, plus prejudgment interest. Hindman now appeals the district court's grant of summary judgment to Wells Fargo on both liability and damages.

## II.   Discussion

We review a district court's grant of summary judgment de novo, *Abbott v. Sangamon Cnty., Ill.*, 705 F.3d 706, 713 (7th Cir. 2013), construing all facts and inferences in favor of the nonmovant, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Summary judgment is proper only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

### A.  Liability

Wells Fargo maintains that Hindman clearly breached the subordination agreements because he transferred $750,000 to Clark, which created a "debt, liability, or obligation" on Clark's part (i.e., "Subordinated Indebtedness"), and because he then accepted repayment of those funds without prior written consent and while Clark had outstanding obligations to Wells Fargo. It argues that we need not concern ourselves with any other facts because the subordination agreements and the subordinated debenture executed by D.D.H. are clear and unambiguous.

Hindman, on the other hand, argues that there are genuine issues of material fact as to whether the funds he transferred were accepted by Clark. In his view, if there was no acceptance then there was not a valid loan because a loan is a contract, and if there was not a valid loan then Clark incurred no "debt, liability, or obligation" to Hindman under the subordination agreements. Alternatively, even if there were a valid loan, Hindman contends that it was either re-

scinded by agreement between him and Clark or repaid with Wells Fargo's consent.

### 1. Creation of Subordinated Indebtedness

In order for Hindman to have breached the subordination agreements, it must be established that his wire transfer created a "debt, liability, or obligation." The parties seem to agree that for this to happen there must have been a valid loan—i.e., they do not argue that the term "Subordinated Indebtedness" is ambiguous.[2] A loan is

> a *contract* by which one delivers a sum of money to another and the latter agrees to return at a future time a sum equivalent to that which he borrows.

> In order to constitute a loan *there must be a contract* whereby, in substance one party transfers to the other a sum of money which that other agrees to repay absolutely, together with such additional sums as may be agreed upon for its use. If such be the intent of the parties, the

---

[2] As a fallback, Hindman does raise the possibility that the term is ambiguous, suggesting that an overly broad reading of "each and every … debt, liability and obligation of every type and description" might include pensions, travel-expense reimbursements, director's fees, or health-insurance premiums but that, when the commercial context is restored, the subordinated agreements clearly would not apply to such "payments" from Clark to Hindman. *See ConFold Pac., Inc. v. Polaris Indus., Inc.*, 433 F.3d 952, 955 (7th Cir. 2006) (discussing latent ambiguity). Given our resolution of Hindman's primary argument, we need not address his alternative contention, which in any event is waived because it was raised for the first time on appeal. *See, e.g.*, *Williams v. Dieball*, 724 F.3d 957, 961 (7th Cir. 2013).

> transaction will be considered a loan without regard to its form.

*Calcasieu-Marine Nat'l Bank v. Am. Emp'rs Ins. Co.*, 533 F.2d 290, 296–97 (5th Cir. 1976) (emphases added) (internal quotation marks omitted) (citing *In re Grand Union Co.*, 219 F. 353, 356 (2d Cir. 1914); *accord United States v. Kristofic*, 847 F.2d 1295, 1296 (7th Cir. 1988). Accordingly, whether the transaction at issue created Subordinated Indebtedness depends on whether a valid loan contract was created between Hindman and Clark.

The basic elements of a contract are offer, acceptance, and consideration. *In re F.T.R.*, 833 N.W.2d 634, 649 (Wis. 2013).[3] Hindman's arguments focus on the element of acceptance. But Wells Fargo suggests that, even though a loan is a contract, acceptance is not a prerequisite to its formation. This is a curious argument, particularly because it comes from a bank. Suppose A walks into a branch of Wells Fargo, plops $10,000 down on the counter, and says, "I am loaning this to you and you will pay me double next week." Under Wells Fargo's view, it would be stuck with the money and owe $20,000 to A the following week, even if the banker to whom A had tendered the money immediately had said "no, thank you," and refused to take the cash. But there clearly would not be an enforceable contract in that scenario. *See Nat'l Bank of Paulding v. Fid. & Cas. Co.*, 131 F. Supp. 121, 123–24 (S.D.

---

[3] Wisconsin law applies to the parties' dispute (with one caveat, noted later) by virtue of a choice-of-law provision in the subordination agreements. But most, if not all, of the legal principles involved in this appeal are well-established rules that are largely uniform throughout the country, which the parties implicitly acknowledge by their heavy reliance on Illinois law.

Ohio 1954) ("In order to have a loan, there must be an agreement, either expressed or implied, whereby one person advances money to the other and the other agrees to repay it upon such terms as to time and rate of interest, or without interest, as the parties may agree. In order to have a contract, there must be a meeting of minds."); *Restatement (Second) of Contracts* § 55 illus. 2 (1981) ("A offers to lend B $100 on specified terms and tenders the money to B. B's acceptance of the tender forms a contract on the terms specified."); *cf. Goossen v. Estate of Standaert*, 525 N.W.2d 314, 318 (Wis. Ct. App. 1994) (valid loan contract existed between borrower and lender, where borrower offered to borrow money, lender accepted offer by processing the loan, and borrower provided consideration by paying lender's loan fee). We thus consider Hindman's arguments that there was never a valid loan due to lack of acceptance.[4]

Under Wisconsin law, "whether an offer was accepted is a question of fact." *Hoeft v. U.S. Fire Ins. Co.*, 450 N.W.2d 459, 463 (Wis. Ct. App. 1989). For "acceptance of a contract to occur, there must be a meeting of the minds, a factual condition that can be demonstrated by word or deed." *Zeige Distrib. Co. v. All Kitchens, Inc.*, 63 F.3d 609, 612 (7th Cir. 1995) (Wisconsin law). Objective manifestations of assent, rather

---

[4] It is important to distinguish between the fundamental contractual element of acceptance and accepting loan proceeds. They are not necessarily the same; it depends on how the parties structure their transaction. *Cf. Restatement (Second) of Contracts, supra*, § 62. Consider the following: A says to B, "if you loan me $10, I promise to pay you $15 a week later." If B subsequently tenders $10 to A, a valid contract is formed upon B's performance and A's refusal of the loan proceeds would constitute a breach. This is a classic example of a unilateral contract. *See, e.g., Patel v. Am. Bd. of Psychiatry & Neurology, Inc.*, 975 F.2d 1312, 1314 (7th Cir. 1992).

than subjective intentions, are controlling. *See Associated Milk Producers, Inc. v. Meadow Gold Dairies, Inc.*, 27 F.3d 268, 272 (7th Cir. 1994) (Wisconsin law).

Hindman does not dispute that he transferred money to Clark with the intent to make a loan, but he argues that the anticipated loan never came into existence because there was no acceptance by Clark, given that D.D.H. had already been stripped of his authority to make business decisions for Clark when he signed the subordinated debenture. Wells Fargo ignores Hindman's argument and contends that the subordinated debenture unambiguously reflects that Hindman made a loan of $750,000 to Clark and that Clark had agreed to repay the loan. It relies on the fact that D.D.H. notified it in late-2009 (before he was stripped of his authority) that Hindman would be making a loan to Clark.

A corporation is a legal entity separate from its directors, officers, and shareholders, *In re Rehab. of Centaur Ins. Co.*, 632 N.E.2d 1015, 1017 (Ill. 1994), but it can act only through "its officers and directors and is bound by their actions when performed within the scope of their authority," *Ahlgren v. Blue Goose Supermarket, Inc.*, 639 N.E.2d 922, 928 (Ill. App. Ct. 1994). Under Illinois law, which governs the internal affairs of an Illinois corporation such as Clark, *see, e.g., Wachovia Sec., LLC v. Banco Panamericano, Inc.*, 674 F.3d 743, 754 (7th Cir. 2012), "the business and affairs of the corporation shall be managed by or under the direction of the board of directors," 805 ILCS 5/8.05(a); *see also Hall v. Woods*, 156 N.E. 258, 267 (Ill. 1927). The board, therefore, "is the true agent of a corporation, and the actions of the directors of the board, if within the scope of the corporate charter, are binding upon

it." *Baltimore & Ohio R.R. Co. v. Foar*, 84 F.2d 67, 70 (7th Cir. 1936).

Wells Fargo offers no evidence to contradict Hindman's evidence that Clark's board of directors stripped D.D.H. of his authority to make business decisions on January 8, 2010, which was four days before the subordinated debenture was executed and five days before the wire transfer. There is no evidence that a loan agreement was completed before January 8. It does not matter that negotiations may have been ongoing since late-2009, when D.D.H. still had authority. *See Perritt Ltd. P'ship v. Kenosha Unified Sch. Dist. No. 1*, 153 F.3d 489 (7th Cir. 1998) (no contract formed for purchase of real estate where, midway through extended negotiations, the school district's status under Wisconsin law changed in a manner divesting the school board of authority to purchase real estate and no agreement had been finalized before the status change). The only evidence in the record shows that D.D.H. lacked actual authority to bind Clark when the purported loan was executed.

We acknowledge that this is a strange case because D.D.H. was not some low-level employee but rather Clark's president and CEO. Generally, a corporation's highest-ranking officers' duties are outlined in the corporation's bylaws, and while the board may alter an officer's authority by resolution, it may do so only if the resolution is consistent with the bylaws. 805 ILCS 5/8.50. However, Clark's bylaws are not part of the record, and Wells Fargo has made no attempt to argue that the board was prohibited from stripping its president and CEO of business-decision-making authority without removing him from his office. Therefore, Wells

Fargo cannot prevail on the theory that D.D.H. retained actual authority to bind Clark in contract.

Nor can Wells Fargo prevail on the ground that D.D.H. had apparent authority, which "'exists where a principal through his words or conduct, creates a reasonable impression that the agent has been granted the authority to perform certain acts,'" *Orix Credit Alliance, Inc. v. Taylor Mach. Works, Inc.*, 125 F.3d 468, 474 n.1 (7th Cir. 1997) (quoting *Wasleff v. Dever*, 550 N.E.2d 1132, 1138 (Ill. App. Ct. 1990)). It is true that "[t]he existence and scope of an agency relationship are questions of fact." *Id.* at 474. But Hindman was present at the meeting where the board stripped D.D.H. of his authority. Thus, he had actual knowledge that D.D.H. could not make business decisions, and he could not have reasonably believed that D.D.H. had authority to enter into a loan agreement on behalf of Clark.

On the other hand, Wells Fargo probably held a reasonable belief that D.D.H. had authority. Indeed, there is no evidence that Clark ever notified Wells Fargo that D.D.H. had been stripped of his authority, and he signed the debenture as president and CEO. But this does not help Wells Fargo for two reasons. First, it was not a party to the purported loan agreement between Clark and Hindman, and we have found no cases in which a plaintiff was able to invoke the doctrine of apparent authority to enforce a contract to which it was not a party. Second, even if Wells Fargo could invoke that doctrine, it would be required to show that it took some action in reliance upon D.D.H.'s apparent authority. *See Harris v. Knutson*, 151 N.W.2d 654, 658 (Wis. 1967) (apparent agency requires "[r]eliance … by the plaintiff, consistent with ordinary care and prudence"). And as discussed below, there

is a genuine dispute of fact as to whether Wells Fargo allowed Clark to take additional cash advances or otherwise acted in reliance on the $750,000 transfer from Hindman.

Because D.D.H. lacked authority to bind Clark under ordinary principles of agency, the fact that he executed the subordinated debenture does not establish that Hindman and Clark had a valid loan agreement. Looking for another reason to bind Clark, one might posit that Clark's board of directors ratified the loan, given that D.D.H. and Hindman constituted a majority of the directors who had previously voted to strip D.D.H. of authority. However, under Illinois law, a board of directors cannot act informally (without a meeting) unless it has the written consent of all directors. 805 ILCS 5/8.45. It is unclear how many directors Clark had, but we do know that at least one director (Robert Early) did not consent to the loan. Thus, the actions of D.D.H. and Hindman did not constitute actions by the board and could not serve to bind Clark to a loan agreement.

Alternatively, Clark may be deemed to have accepted the loan agreement through its actions, for example, if it put the loan proceeds to use. *See Hoffman v. Ralston Purina Co.*, 273 N.W.2d 214 (Wis. 1979) (finding acceptance where offeree accepted benefits of offer but never expressly accepted and, in fact, said he would not accept); *Phillips Petroleum Co. v. Taggart*, 73 N.W.2d 482, 488 (Wis. 1955) ("One cannot accept the benefits of a contract over a long period of time and then successfully contend that the contract is not binding.").

Hindman argues that Clark never took any advances based on the $750,000 and that the people with authority to bind Clark took immediate action to reject the purported loan by instructing D.D.H. to stop the wire transfer. For its

part, Wells Fargo maintains that Clark accepted the loan through its conduct and points to three facts: (1) $750,000 appeared on Clark's daily collateral report for January 15, which had been signed by Clark's treasurer, Robert Sears; (2) once Wells Fargo received that report, Williams spoke with another Clark representative, Maria Preston, who informed her that the influx of cash was another capital loan from Hindman (Appellee's Supp. App. 52); and (3) Clark used the $750,000 to pay down its line of credit and took $3,036,089.96 in advances between January 15 and January 21.

We conclude that there are genuine issues of material fact that need to be resolved before determining whether Clark accepted through its actions. Hindman has designated evidence showing that the people with authority to make business decisions acted swiftly in attempting to reject his loan once they found out about it. There is no dispute that, despite those efforts, the wire transfer went through and the funds hit Clark's account. Though not entirely clear, it appears that the daily collateral reports were accounting ledgers showing what money was coming in and that all incoming funds had to be reported. In other words, it is not clear from the record that Clark had the option of not reporting the funds on the daily collateral report once they hit its account. That Preston informed Williams that the cash influx was another capital loan from Hindman is not dispositive. There is nothing to support the notion that Preston had authority to bind Clark to a loan obligation or that she was even purporting to do so; rather, all that can be said is that she believed a valid loan had been made and relayed that information to Williams, but Preston was not in the loop of decision makers.

Finally, there is a disputed question of fact as to whether Clark actually used the $750,000 to take cash advances. Although the record shows that $3,036,089.96 was advanced between January 15 and January 21, when the $750,000 (which is included in that figure) was wired to Gibraltar Bank by Bassett, Wells Fargo has failed to demonstrate that those advances could not have been taken but for the influx of $750,000 on January 15. The daily collateral report for January 15 shows that Clark had $2,727,430.26 available for borrowing. (Appellee's Supp. App. 64.) Set aside Hindman's $750,000 for the moment and the total available for borrowing becomes $1,977,430.26, which was more than enough to cover the $471,668.95 in advances taken on January 15, and even the additional advances of $910,793.56 and $592,208.82 taken on January 19 and 20, respectively (as the advances for those three days total $1,974,671.33). Of course, the total advances between January 15 and 21 exceed the borrowing availability reflected on the January 15 daily collateral report (which includes the $750,000) by $308,659.70. The problem with concluding that this shows Clark to have drawn on the $750,000 is that, although all advances between January 15 and 21 are accounted for, there is no evidence as to how much incoming cash Clark received on January 19, 20, and 21 with which it paid down its line of credit.[5] The only daily collateral report included in the record is for January 15.

We agree with Wells Fargo that if Clark in fact took advances that it could not have taken but for the influx of

---

[5] That the total advances taken over those four days exceeds the borrowing availability reflected on the January 15 daily collateral report suggests that there was incoming cash, because otherwise Wells Fargo would have been allowing an overdraft of $308,659.70.

$750,000 from Hindman, then Clark accepted the loan as a matter of law, notwithstanding the fact that the authorities at Clark were attempting to have the loan funds rejected. If, on the other hand, Clark took only advances that it could have taken without Hindman's funds, then it is difficult to see how Clark accepted the loan given the wealth of evidence that those with decision-making authority promptly took steps to reject the funds, though a trier of fact might find otherwise after gauging witness credibility and examining the documentary evidence. The record developed thus far does not provide an answer either way.

This is a very peculiar case. The district court erred in casting aside Hindman's arguments as irrelevant. There may be grounds for rejecting Hindman's theory, but relevance is not one of them. We need not explore what those other grounds may be because Wells Fargo has not bothered to raise them and instead has largely ignored Hindman's specific contentions concerning D.D.H.'s authority. Although Clark may have accepted through its conduct, there are too many factual uncertainties in this record to warrant summary judgment in either party's favor.

Because the record is unclear as to whether Clark accepted Hindman's purported loan, thereby creating Subordinated Indebtedness, we cannot say that Hindman breached the subordination agreements as a matter of law. This problem alone requires that the district court's judgment be vacated and the cause remanded for further proceedings. The parties, however, quarrel over several other issues that are likely to reappear on remand if Clark is found to have accepted Hindman's loan. We will address those issues in the interest

of judicial economy. *See, e.g.*, *Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753, 763 (7th Cir. 2013).

## 2. Rescission

Assuming a valid loan agreement was created, Hindman contends that he still is not liable for breach because he and Clark rescinded the loan agreement and the subordination agreements did not prevent them from doing so. Both parties use Illinois law to establish the test for rescission: "A claim for rescission is sufficient if it alleges: (1) substantial nonperformance or breach by the defendant; and (2) that the parties can be restored to the status quo *ante*." *Horwitz v. Sonnenschein Nath & Rosenthal LLP*, 926 N.E.2d 934, 942 (Ill. App. Ct. 2010) (citation omitted). Wells Fargo argues that rescission was not permitted under *Horwitz* because it would not be restored to the status quo *ante*. But Wells Fargo is neither a party nor a third-party beneficiary to the putative loan agreement between Hindman and Clark, and *Horwitz* speaks of the *parties* being restored to their previous positions. Moreover, the test articulated in *Horwitz* applies only where the parties disagree and the party seeking rescission is doing so on the basis of the other party's nonperformance (hence the prong dealing with substantial nonperformance or breach). *See* 926 N.E.2d at 942–43. Here, however, Hindman claims that he and Clark *agreed* to rescind the purported loan agreement, *see, e.g.*, *St. Norbert Coll. Found., Inc. v. McCormick*, 260 N.W.2d 776, 782 (Wis. 1978), so it is not clear how *Horwitz* is applicable.

In any event, we agree with Wells Fargo that the subordination agreements prohibited Hindman and Clark from rescinding the loan agreement without prior written consent. Hindman accurately points out that the subordination

agreements contain no express language on the issue of rescission. But rescission becomes a possibility only once a contract is formed, that is, once a "debt, liability or obligation" has been created. The subordination agreements prohibited Hindman from accepting repayment from Clark on those debts, liabilities, and obligations while Clark remained indebted to Wells Fargo (absent consent). Allowing Hindman and Clark to agree to rescind their purported loan agreement would render the subordination agreements useless. Under Hindman's theory, Clark could use all loans from Hindman to pay down its line of credit, take more advances from Wells Fargo, and then turn around and agree with Hindman to rescind the loan agreements, resulting in Hindman receiving payment before Wells Fargo, which is precisely what the subordination agreements were intended to prevent. Thus, assuming a valid loan agreement was created in the first place, Hindman cannot escape liability for breach under a theory of rescission.

### 3. Consent

Paragraph 3 of the subordination agreements provides in relevant part that Hindman "shall not, without the Lender's *prior written consent*, demand, receive or accept any payment (whether of principal, interest or otherwise) from any Borrower in respect of the Subordinated Indebtedness." (Emphasis added.) Hindman argues that he did not breach the subordination agreements because Wells Fargo consented to the repayment through its representative, Thomas Bassett. Wells Fargo says that Bassett had no authority to give consent and, in any event, that the evidence is undisputed that Bassett did not consent.

We think there are genuine issues of material fact concerning this issue. It is true that Bassett was a vice-president of Wells Fargo *Bank* with responsibility over Hindman's personal accounts, whereas responsibility for Clark's business accounts rested with Wells Fargo *Business Credit*. But the subordination agreements recite that they are "for the benefit of WELLS FARGO BANK, NATIONAL ASSOCIATION (the 'Lender'), acting through its Wells Fargo Business Credit operating division."

That the subordination agreements define "Lender" as Wells Fargo *Bank* and require prior written consent to come from the Lender makes them susceptible to the interpretation that consent from Wells Fargo *Bank* was sufficient. However, the "acting through" language gives rise to another reasonable interpretation, i.e., that consent must come from Wells Fargo *Business Credit*. Because the agreements are "susceptible to more than one reasonable interpretation," they are ambiguous, and extrinsic evidence may be considered to resolve the ambiguity. *See Town Bank v. City Real Estate Dev., LLC*, 793 N.W.2d 476, 484 (Wis. 2010). If extrinsic evidence does not resolve the ambiguity, the agreements should be construed against the drafter, Wells Fargo. *See Roth v. City of Glendale*, 614 N.W.2d 467, 476 (Wis. 2000) (Sykes, J., concurring) (explaining that default rules, such as construction against the drafter, are tie-breakers that are applied only after extrinsic evidence has been examined).

Just as they did before the district court, the parties all but ignore this controlling provision and make unsupported assertions that Bassett either did or did not have authority to consent. The district court, for its part, did not discuss the issue of consent at all. Thus, it is unclear whether Wells Far-

go could point to extrinsic evidence showing that the parties intended for consent to be obtained from Wells Fargo Business Credit. If not, the provision should be construed against Wells Fargo such that consent from Wells Fargo Bank would suffice. But we simply cannot tell from this record.

Moreover, even assuming the requisite consent could come from Bassett, Hindman is not necessarily entitled to summary judgment. Curiously, Wells Fargo makes little of the fact that the subordination agreements require "prior written consent." It is debatable whether the January 15 email from Bassett to D.D.H. reading "Done!" amounts to prior written consent or is merely an after-the-fact confirmation of the failed reversal. A fact finder, however, might reasonably view it as written consent to support the eventual transfer to the Florida bank on January 21. The subordination agreements, after all, do not define the parameters of the term "prior written consent."

All this goes to show that at this point there is a genuine dispute of fact as to the issue of consent. But further development of the record and the parties' legal arguments on remand may add sufficient clarity that it can be decided as a matter of law.

### B. Damages

In the event of a breach, the subordination agreements provide that the amount of unauthorized payment received by Hindman shall be held in trust and turned over to Wells Fargo. Hindman argues that this "Prohibited Payments Clause" is an unenforceable liquidated-damages clause. Wells Fargo maintains that this is a moot point because its actual damages were $750,000.

We agree with Wells Fargo and the district court that, if Hindman breached, the proper award of damages is $750,000. "In a breach of contract action, the fundamental idea is to put the injured party in as satisfactory a position as the party would have been in had the contract been performed." *Int'l Prod. Specialists, Inc. v. Schwing Am., Inc.*, 580 F.3d 587, 598 (7th Cir. 2009) (citing *Thorp Sales Corp. v. Gyuro Grading Co.*, 331 N.W.2d 342, 346 (Wis. 1983)). Had Hindman not breached the subordination agreements by accepting payment of $750,000, there would have been $750,000 more in assets available for Clark to use in paying down its unpaid debt to Wells Fargo (its most senior creditor), which as of March 25, 2011, was $7,306,098.34.

Hindman argues that Wells Fargo's actual damages are limited to the amount of additional advances taken against the $750,000. He posits that if it can be shown that Clark took, for example, only $100,000 in additional advances, then Wells Fargo's actual damages are only $100,000. In other words, if Wells Fargo *relied* on the $750,000 only to the extent of the $100,000 it allowed Clark to take, it would provide a windfall of $650,000 to award Wells Fargo $750,000.

We disagree. The subordination agreements between Hindman and Wells Fargo were intended to ensure that Clark paid off its debts to Wells Fargo before paying off its debts to Hindman. Wisconsin law calls for placing the non-breaching party in the position it would have been in had the contract been performed instead of simply restoring the parties to their original positions. Assuming that Hindman breached, the only way to place Wells Fargo in the position that it would have been in had Hindman not breached would be to award the full $750,000. As Wells Fargo's actual

damages are $750,000 (again, assuming breach), the enforceability of the "Prohibited Payments Clause" is immaterial.

### III.   Conclusion

For the foregoing reasons, the district court's judgment is VACATED and the cause is REMANDED for further proceedings consistent with this opinion.