COURT OF APPEALS
DECISION
DATED AND FILED

February 25, 2021

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

**Appeal No. 2019AP1575**

**STATE OF WISCONSIN**

Cir. Ct. No. 2017CV488

**IN COURT OF APPEALS
DISTRICT IV**

MDS ENTERPRISES, INC.,

PLAINTIFF-APPELLANT,

V.

MID-STATE TRUCK SERVICE, INC., NAVISTAR INTERNATIONAL
CORPORATION AND NAVISTAR, INC.,

DEFENDANTS-RESPONDENTS.

APPEAL from judgments of the circuit court for Jefferson County: ROBERT F. DEHRING, Judge. *Modified and, as modified, affirmed*.

Before Fitzpatrick, P.J., Kloppenburg, and Nashold, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1     PER CURIAM.   MDS Enterprises, Inc. ("MDS") appeals the circuit court's orders granting summary judgment and dismissing all six of its claims against Mid-State Truck Service, Inc., Navistar, Inc., and Navistar International Corporation (collectively, "Defendants").   We affirm summary judgment in favor of Defendants dismissing all claims, but we reduce the award of costs to Defendants by $1,000.

## BACKGROUND

¶2     The following background is derived from the parties' pleadings and from the affidavits and exhibits attached to the parties' summary judgment submissions.  The parties do not dispute the pertinent facts for purposes of this appeal. MDS is a Wisconsin corporation in the business of moving furniture. MDS shares common ownership and a principal place of business with another Wisconsin corporation, Horizon Rental, LLC.   In three sets of transactions occurring in 2012, 2013, and 2016, Horizon purchased trucks from commercial truck dealer Mid-State Truck Service, Inc., ("Mid-State") and leased them to MDS.[1]   The trucks bore the brand name International and were manufactured by Navistar, Inc., a subsidiary of Navistar International Corporation (collectively, "Navistar").

¶3     The trucks were part of Navistar's "MaxxForce" line, which contained an "Engine Gas Recirculation" ("EGR") system that Navistar developed in response to a rule promulgated by the Environmental Protection Agency in

---

[1]  It is undisputed that Horizon assigned to MDS any and all claims and causes of action Horizon may have had against Defendants as related to the purchase of the trucks at issue. Therefore, we refer only to MDS, which at times may include Horizon, and do not refer further to Horizon.

2

2001. Each of the trucks purchased in the 2012, 2013, and 2016 transactions contained MaxxForce engines with an EGR system.

¶4      MDS acquired ten International ProStar trucks from Mid-State in the 2012 transactions and five International Model 4300 trucks from Mid-State in the 2013 transactions. The sales contract for each of the fifteen trucks used a standard "Motor Vehicle Purchase Contract" form issued by the Wisconsin Automobile & Truck Dealers Association. The sales contracts state that MDS is purchasing the trucks from Mid-State "AS IS" and disclaimed all other warranties, including implied warranties of merchantability and fitness for a particular purpose. The sales contracts also indicate that the trucks come with a "New Vehicle Manufacturer Warranty" and that the parties should refer to a separate document for coverage and exclusion terms for that warranty. The separate document for each truck, captioned "limited warranty," warrants that Navistar, "at its option, will repair or replace any part of this vehicle that proves defective in material or workmanship, in normal use and service, with new or ReNEWed® parts."[2] The limited warranty also includes a disclaimer stating that no other warranties, express or implied, are provided, and specifically disclaims warranties of merchantability and fitness for a particular purpose.

¶5      After placing the original fifteen trucks into service, MDS experienced what MDS refers to as "numerous breakdowns" involving the EGR

---

[2] The ProStar New Vehicle Manufacturer Warranty for the trucks purchased in 2012 and the Model 4300 New Vehicle Manufacturer Warranty for the trucks purchased in 2013 have separate but almost identical versions of the language describing the repair-or-replace provision, which differ only in minor punctuation and word choice that are of no consequence to the issues on appeal. For ease of reference, we use the text from the ProStar version. Also, we generally refer to the New Vehicle Manufacturer Warranty that contains the repair-or-replace provision as the "limited warranty," in keeping with the caption of that document.

system and its related equipment, leading it to have the trucks repaired by Navistar's authorized repair agents pursuant to the limited warranty. Although Navistar and its authorized agents never declined to repair the original fifteen trucks, the trucks continued to experience EGR-related breakdowns even after being serviced.

¶6 MDS and Mid-State later negotiated a deal whereby MDS would trade in ten ProStar trucks it previously purchased through Mid-State for replacement trucks. The parties finalized the trade-in deal in 2016. MDS traded in its ten ProStar trucks for ten replacement ProStar trucks that had previously been owned by another commercial trucking company, Roehl Transport ("Roehl"). The replacement trucks were covered by Navistar custom service contracts ("extended warranties")[3] that Roehl had purchased. MDS and Mid-State executed a set of forms that transferred the Navistar extended warranties from Roehl to MDS. The extended warranties contain similar "repair or replace" language to that in the original warranties.

¶7 After the trade was executed and the replacement ProStars were in MDS's possession, the replacement ProStars experienced EGR-related engine problems. As with the original ProStars and Model 4300s, MDS submitted the trucks to Navistar's authorized repair agents for warranty service, and the trucks were serviced. Eventually, continued breakdowns associated with the EGR components led MDS to file suit against Mid-State and Navistar.

---

[3] Because the parties refer to the custom service contracts as extended warranties, we do so here.

¶8 MDS's amended complaint alleges six counts, three against Navistar and three against Mid-State. MDS's first count alleges breach of express warranty against Navistar with respect to all twenty-five trucks.[4] MDS alleges that the authorized repair work done pursuant to the repair-or-replace provisions failed to remedy the problems with the trucks' EGR systems and related engine problems, causing any and all warranties to fail of their essential purpose. Counts two and three allege that Navistar breached implied warranties of merchantability (count two) and fitness for a particular purpose (count three) due to flaws in the engines in all twenty-five trucks. Counts four through six allege various claims against Mid-State regarding Mid-State's alleged representations that the ten replacement ProStars were "much more reliable" than the original ProStars and that they had "next generation" engines.

¶9 Defendants filed motions for summary judgment requesting dismissal of all counts, which the circuit court granted. The court also awarded costs to Defendants. MDS appeals.

## DISCUSSION

¶10 "We review de novo a circuit court's ruling on summary judgment, and apply the same legal principles." *Chapman v. B.C. Ziegler & Co.*, 2013 WI App 127, ¶2, 351 Wis. 2d 123, 839 N.W.2d 425. Under that methodology, we examine the moving party's submissions to determine whether they establish a prima facie case for summary judgment. *See Tews v. NHI, LLC,* 2010 WI 137,

---

[4] Count one of the complaint also alleged that Navistar breached a warranty required by an Environmental Protection Agency rule, 42 U.S.C. 7541(a)(1). The circuit court dismissed this portion of count one, determining that it was preempted by federal law, and MDS does not challenge this determination on appeal.

¶41, 330 Wis. 2d 389, 793 N.W.2d 860. If the moving party has made a prima facie showing, we examine the opposing party's affidavits and other proof to determine whether summary judgment is appropriate. *See id.* Ultimately, summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." WIS. STAT. § 802.08(2).[5] "[W]e draw all reasonable inferences from the evidence in the light most favorable to the non-moving party." ***Pum v. Wisconsin Physicians Serv. Ins. Corp.***, 2007 WI App 10, ¶6, 298 Wis. 2d 497, 727 N.W.2d 346. The purpose of summary judgment is "to avoid trials when there is nothing to try." ***Tews***, 330 Wis. 2d 389, ¶42.

¶11 We review an award of costs under the erroneous exercise of discretion standard. *See **Lane v. Sharp Pkg. Sys., Inc.***, 2002 WI 28, ¶66, 251 Wis. 2d 68, 640 N.W.2d 788.

¶12 For the reasons explained below, we conclude that Defendants are entitled to summary judgment dismissing all six of MDS's claims. We also conclude that the circuit court properly awarded video deposition costs to Defendants but erroneously awarded costs to Defendants for pro hac vice fees.

## I. *Count One Against Navistar: Breach of Express Warranty – Failure of Essential Purpose*

¶13 MDS argues that Defendants are not entitled to summary judgment dismissing count one, which alleges breach of express warranty. MDS contends

---

[5] All references to the Wisconsin Statutes are to the 2017-18 version unless otherwise noted.

that the repair-or-replace provision for each of the twenty-five trucks failed of its essential purpose because authorized repair work on the trucks failed to remedy the defective EGR system and related engine problems. For reasons we now explain, we conclude that, based on the undisputed facts, no reasonable factfinder could find that the repair-or-replace provisions failed of their essential purpose, and that as a result, there was no breach of Navistar's express warranty.

¶14 A seller may disclaim or limit express warranties. *See* WIS. STAT. § 402.316. Where an express warranty fails of its essential purpose, a buyer may pursue the full panoply of remedies under the Uniform Commercial Code (UCC), as adopted in Wisconsin. *See* WIS. STAT. § 402.719(2). A repair-or-replace provision may fail of it essential purpose "where the cumulative effect of all the nonconformities substantially impairs the value of the goods to the buyer." *Murray v. Holiday Rambler, Inc.*, 83 Wis. 2d 406, 421, 265 N.W.2d 513 (1978); *see also Southern Fin. Grp., LLC v. McFarland State Bank*, 763 F.3d 735, 741 (7th Cir. 2014) (contractual remedies fail of their essential purpose where a party is deprived of the "substantial value of the bargain"). Even where parties have agreed to limit the remedies available, those limitations may not deprive a party of "a fair quantum of remedy." *Phillips Petroleum Co. v. Bucyrus-Erie Co.*, 131 Wis. 2d 21, 40, 388 N.W.2d 584 (1986).

¶15 Here, it is undisputed that for each repair event, Navistar performed the requested repair and MDS accepted the truck and put the truck back into service, as promised by the repair-or-replace provision. It is also undisputed that, as shown below, MDS placed hundreds of thousands of miles on each of these trucks over the several years that it owned them, demonstrating that MDS was not deprived of a fair quantum of remedy.

¶16    As to the latter point, the record shows that the ten ProStar trucks that MDS purchased in 2012 averaged approximately 500,000 miles when MDS traded them in after three and a half years of use.  Similarly, the five Model 4300 trucks purchased in 2013 were run for between 226,309 and 308,227 miles during the years MDS owned them.  As for the ten replacement trucks, when MDS acquired them, they had between 338,440 to 349,049 miles, and approximately a year and a half later, the mileage on these trucks ranged from 487,526 to 586,491.  MDS does not dispute the number of miles the trucks operated, nor has our review of the record revealed any genuine dispute about the extent of the vehicles' use while in MDS's possession.

¶17    Further, as Defendants note, MDS identified eighty-one repair dates over twenty-five trucks over five years,[6] compared to what Defendants refer to as the 3,755 "truck-weeks" over which MDS owned the trucks.  MDS concedes that the repair records do not show how long any truck was out of commission, and MDS points to no other material in the record containing this information.[7] Defendants observe that, even assuming each repair took a truck out of commission for a week, Navistar's repairs enabled MDS to operate these trucks

---

[6] MDS states in its brief-in-chief that the records show a total of eighty-one dates that the trucks required repair due to the faulty EGR systems.  In its reply brief, however, MDS states that "from January 2016 to July 2017, the [replacement] trucks required at least 65 repairs, averaging nearly 7 repairs per truck."  It appears that the sixty-five figure includes non-EGR-related services.  However, MDS does not state what the sixty-five repairs were, and the documents it points to in the record are unclear as to what services were provided and whether the services were repairs or routine maintenance.  Because this portion of MDS's reply is inadequately briefed, we do not consider it.  *See State v. Pettit*, 171 Wis. 2d 627, 646, 492 N.W.2d 633 (Ct. App. 1992) (we need not consider inadequately briefed arguments).

[7] We note one possible exception.  MDS's president asserted in an email that one of the twenty-five trucks was down for ten days for repair.  It is not clear whether the repair was EGR-related.

more than 97% of the time without EGR-related breakdowns. MDS does not dispute Defendants' figures and conclusions, nor does our review of the record reveal that they are inaccurate. In sum, we conclude that the undisputed facts entitle Defendants to summary judgment dismissing MDS's first claim alleging breach of express warranty. We now address MDS's arguments to the contrary.

¶18    First, MDS argues that *Murray* supports the conclusion that Navistar's repair-or-replace provisions failed of their essential purpose. In *Murray*, the plaintiffs purchased a motorhome and, during an approximately six-month period following the purchase, had to have the motorhome repaired at the manufacturer's authorized dealer at least nine times. *Murray*, 83 Wis.2d at 412. After the plaintiffs returned from a trip with the motorhome, it was once again sent in for repairs, and arrangements were made to ship the motorhome to a factory in Indiana. *Id.* at 412-13. The vehicle had a litany of issues, including problems with lights, battery, electrical system, generator, gas tank, auxiliary gas tank, air suspension system, steering, front brakes, furnace, refrigerator, folding seats, a water line, and kitchen equipment. *Id.* at 422-23. The contract for the motorhome warranted "that the product … was free of defects in material and workmanship at the time of its delivery." *Id.* at 417. However, the warranty also limited the remedies to repair or replacement of defective parts. *Id.* at 419. Following a trial, the jury determined that the plaintiffs had cause to revoke acceptance of the motorhome. *Id.* at 421.

¶19    On appeal, our supreme court upheld the jury's determination, stating that the "evidence amply supports the conclusion that, despite reasonable opportunity for repair, the defendants had failed to provide the [plaintiffs] with goods conforming to the contract—that is, with a safe and substantially non-defective motorhome within a reasonable time after purchase." *Id.* at 425. The

9

court reasoned that "[a]t some point in time, if major problems continue to plague the automobile, it must become obvious to all people that a particular vehicle simply cannot be repaired or parts replaced so that the same is made free of defect...." *Id.* at 420-21. The court explained: "Where the seller is given reasonable opportunity to correct the defect or defects, and the vehicle nevertheless fails to operate as should a new vehicle free of defects, the limited remedy fails of its essential purpose." *Id.* at 421.

¶20 MDS argues that, as in *Murray*, the twenty-five trucks at issue here "never can or will be made free of defect," specifically, the EGR-related engine problems, and that the circuit court therefore erred in granting summary judgment on MDS's breach of express warranty claim. However, unlike in *Murray*, the undisputed facts in this case, as set forth above, are insufficient to establish that the repair-or-replace provisions at issue here failed of their essential purpose.[8]

¶21 Second, citing *Durfee v. Rod Baxter Imports, Inc.*, 262 N.W.2d 349 (Minn. 1977), MDS appears to argue that there remains a dispute about whether the repairs here were successfully undertaken within a reasonable time. *See Durfee*, 262 N.W.2d at 356 ("So long as the seller repairs the goods each time a defect arises, a repair-and-replacement clause does not fail of its essential purpose. But if repairs are not successfully undertaken within a reasonable time, the buyer may be deprived of the benefits of the exclusive remedy.") (footnote omitted). However, MDS never introduced any evidence, nor did its complaint allege, that

---

[8] Likewise, this case is therefore distinguishable from *Smith v. Navistar International Transportation Corp.*, 714 F. Supp. 303, 306 (N.D. Ill. 1989), upon which MDS also relies. In *Smith*, a single truck required repairs on at least ten separate occasions within the first six months it was owned, for a total of forty-five days of repairs. *Id.* at 306.

repairs were not successfully undertaken within a reasonable time. We therefore reject as unsupported by the record any argument that unreasonable delays in repairing the trucks caused the repair-or-replace provisions to fail of their essential purpose.

¶22 Third, MDS appears to argue that whether a repair-or-replace provision fails of its essential purpose is always a question of fact for the jury. In support, MDS cites *Midwhey Powder Co. v. Clayton Industries*, 157 Wis. 2d 585, 592-93, 460 N.W.2d 426 (Ct. App. 1990), in which we concluded that, when the facts showed a dispute about whether the defendants "failed or refused to effect repairs as required by the terms of the warranty," the question was one for a jury. MDS reads *Midwhey* too broadly. *Midwhey* does not preclude summary judgment whenever the issue is whether a repair-or-replace provision fails of its essential purpose. Indeed, when, as here, the record evidence permits only one inference, that question of fact may be decided by the court as a matter of law. *See Groom v. Professionals Ins. Co.*, 179 Wis. 2d 241, 249, 507 N.W.2d 121 (Ct. App. 1993) (where only one inference can reasonably be drawn from undisputed facts, court may decide issue as a matter of law).[9]

¶23 In sum, we conclude that Defendants are entitled to summary judgment dismissing count one of the amended complaint against Navistar.

---

[9] In its briefing in this court discussing whether the repair-or-replace provisions failed of their essential purpose, MDS asserts that it never received any limited warranty documents and that therefore any warranty limitations were not part of the sales contract. However, MDS fails to explain how this fact, even if true, bears on the issue of whether the repair-or-replace provisions failed of their essential purpose as MDS alleges in its amended complaint. MDS's argument related to not receiving these documents is addressed in the next section discussing MDS's claims for breach of implied warranties.

*II. Counts Two and Three Against Navistar: Implied Warranties of Merchantability and Fitness for a Particular Purpose*

¶24    In counts two and three of its amended complaint, MDS alleges that Navistar violated the implied warranties of merchantability and fitness for a particular purpose with respect to all twenty-five trucks.  *See* WIS. STAT. § 402.314 (merchantability); WIS. STAT. § 402.315 (fitness for a particular purpose).  As stated, each of the fifteen trucks purchased in 2012 and 2013[10] came with a limited warranty that specifically disclaimed all other warranties, including implied warranties of merchantability and fitness for a particular purpose.  The limited warranty provided:

> NO WARRANTIES ARE GIVEN BEYOND THOSE DESCRIBED HEREIN. THIS WARRANTY IS IN LIEU OF ALL OTHER WARRANTIES, EXPRESSED OR IMPLIED. [NAVISTAR] SPECIFICALLY DISCLAIMS WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE, ALL OTHER REPRESENTATIONS TO THE USER/PURCHASER, AND ALL OTHER OBLIGATIONS OR LIABILITIES. [NAVISTAR] FURTHER EXCLUDES LIABILITY FOR INCIDENTAL AND CONSEQUENTIAL DAMAGES, ON THE PART OF THE COMPANY OR SELLER. No person is authorized to give any other warranties or to assume any liabilities on [Navistar's] behalf unless made or assumed in writing by [Navistar], and no other person is authorized to give any warranties or to assume any liabilities on the seller's behalf unless made or assumed in writing by the seller.

The sales contracts for the fifteen trucks purchased in 2012 and 2013 state: "WARRANTY INFORMATION … Refer to separate document for coverages

---

[10] Defendants state in their response brief that "[e]ach of the warranties provided by Navistar also contained" the warranty-disclaiming language, and MDS does not dispute this assertion in its reply.

and exclusions." A box is checked underneath, showing that each truck came with a "New Vehicle Manufacturer Warranty," i.e., the limited warranty referred to above. Likewise, the transfer forms for the ten replacement trucks expressly reference the warranties being transferred, and the sales contracts for the replacement trucks disclaim all other warranties.

¶25 Although the limited warranty disclaims implied warranties, MDS argues that it never received any of the limited warranties, that a jury should decide whether the disclaimers were part of the contract for the sale of the trucks, and that therefore its claims for breach of implied warranty should not have been dismissed on summary judgment.

¶26 In response, Defendants argue that it is not material whether MDS received the limited warranties because, by accepting the benefits of the warranties, MDS also accepted their limitations, including the disclaimer of implied warranties. As previously noted, MDS submitted at least eighty-one claims under the warranty over its years of ownership of the twenty-five trucks. In support of their argument, Defendants rely on *Sunnyslope Grading, Inc. v. Miller, Bradford & Risberg, Inc.*, 148 Wis. 2d 910, 437 N.W.2d 213 (1989), and *Midwhey Powder Co. v. Clayton Industries*, 157 Wis. 2d 585, 460 N.W.2d 426 (Ct. App. 1990). *Sunnyslope* and *Midwhey* each addressed whether a buyer was permitted to bring a tort action for economic losses arising out of commercial transactions in which the manufacturer had provided a limited warranty to the buyer. *See Sunnyslope*, 148 Wis. 2d at 913-15; *Midwhey*, 157 Wis. 2d at 587-88.

¶27 Like the limited warranty here, in *Sunnyslope*, the warranties provided to the buyer Sunnyslope by the manufacturer Hein-Werner were limited to repairing or replacing defective parts and expressly disclaimed all other

warranties, including implied warranties of merchantability and fitness for a purpose. *Sunnyslope*, 148 Wis. 2d at 912-14 & n. 1, 2. And, as MDS did here, Sunnyslope availed itself of repairs under the warranty numerous times. *See id.* at 914. Sunnyslope later brought tort claims against Hein-Werner, seeking damages for items excluded by the warranty. *Id.* at 914-15. Our supreme court disallowed Sunnyslope's actions in tort because the warranty expressly disclaimed the type of damages sought, concluding:

> Hein–Werner offered a warranty to the purchasers of its products. The warranty specified that Hein–Werner would do certain things for purchasers and would not do certain other things. There was a warranty in effect between the parties and evidence of this was Sunnyslope's accepting repairs under it. *As previously noted, Sunnyslope implicitly acknowledged the validity of the warranty when it accepted repairs under the warranty.*

*Id.* at 915 (emphasis added).

¶28 Similarly, in *Midwhey*, this court rejected a buyer's argument that that "the attempt to limit remedies by a warranty issued after the purchase is ineffective." *Midwhey*, 157 Wis. 2d at 591. Relying on *Sunnyslope*, we concluded that the buyer's acceptance of repairs under the manufacturer's warranty evidenced the validity of the limitations in that warranty. *See id.* at 591-92.

¶29 Defendants also point to federal cases in which courts have concluded that the buyers' course of conduct showed that they assented to warranty disclaimers that constituted material alterations of the original contracts. *See Twin Disc, Inc. v. Big Bud Tractor, Inc.*, 772 F.2d 1329, 1334-35 (7th Cir. 1985) (explaining that an "explicit course of conduct" qualifies as express assent to warranty provisions where, among other factors, the buyer "invoked the

warranty on many occasions and processed over 210 claims under it"); *Waukesha Foundry, Inc. v. Industrial Eng'g, Inc.*, 91 F.3d 1002, 1009 (7th Cir. 1996) (buyer's repeatedly availing itself of warranty remedies showed assent to warranty terms).

¶30     MDS fails to address Defendants' arguments based on *Sunnyslope*, *Midwhey*, and federal case law, either in its appellant's brief or in its reply. Despite Defendants' argument and citation to authority on this point in their response brief, MDS's reply simply repeats its denial of having received any warranty documents ("with the exception of the limited references to warranties contained on the vehicle purchase contracts and warranty transfer forms that it had signed") and states that the question of whether MDS received or knew of such disclaimers constitutes a material dispute of fact.  In light of the persuasive argument and authority provided by Defendants that MDS fails to refute, we accept Defendants' argument.  *See Fischer v. Wisconsin Patients Comp. Fund*, 2002 WI App 192, ¶1 n.1, 256 Wis. 2d 848, 650 N.W.2d 75 ("An argument asserted by a respondent on appeal and not disputed by the appellant in the reply brief is taken as admitted.").[11]  Thus, we conclude that MDS accepted the terms of the limited warranty—including the disclaimers of warranties for merchantability and fitness for a particular purpose—when MDS repeatedly availed itself of the benefits of that same warranty.  As a result, Defendants are entitled to summary

---

[11] MDS states in a footnote that any argument made in Defendants' response brief that is not addressed in MDS's reply brief "is not being conceded or waived" but rather was "already adequately addressed" in its initial brief and will not be restated in MDS's reply brief "due to word count limitations."  However, as previously stated, MDS's initial brief does not address the arguments raised by Defendants and relied on here.

judgment dismissing MDS's claims alleging breach of implied warranties of merchantability and fitness for a particular purpose.

### III. Counts Four and Five Against Mid-State: Breach of Contract and Breach of Express Warranty

¶31 Count four of MDS's complaint alleges that Mid-State breached its contractual agreement to sell the ten replacement trucks with "next generation MaxxForce engines that were much more reliable than the engines in the previous trucks" MDS was trading in.[12] Count five alleges that Mid-State breached an express warranty based on these same representations.

¶32 The undisputed facts pertinent to these counts are as follows. As stated, in 2016, MDS and Mid-State completed a trade-in deal whereby MDS traded in its ten 2013 ProStar trucks with higher mileage for ten 2013 ProStar trucks with lower mileage and with Navistar extended warranties that transferred from the previous owner, Roehl, to MDS. During the course of negotiations between MDS and Mid-State for the replacement trucks, Mid-State's president represented to MDS that "[t]he 2013 product has been much more reliable than the 2011 and 2012 product." It is undisputed that, at the time Mid-State made this statement, Mid-State was under the mistaken impression that MDS was looking to trade in ten model year 2012 ProStars. MDS's terminal manager later clarified that the trucks MDS sought to trade in were not from 2012, by informing Mid-

---

[12] Count four also alleges that Mid-State breached the agreement by transferring Navistar's extended warranties from Roehl to MDS, "which warrant[ies] Mid-State knew would fail of [their] essential purpose, as Navistar and its authorized service centers were unable to correct defects attributable to the faulty EGR system." As discussed above, we have concluded that Defendants are entitled to summary judgment dismissing MDS's claim that the repair-or-replace provisions failed of their essential purpose. Thus, MDS's allegation with respect to Mid-State's transfer of the Navistar extended warranties necessarily fails.

16

State, "By the way, according to everything I have our trucks are 2013 also." It is also undisputed that once MDS clarified that its trucks were 2013 models, there was no further discussion of trucks from model year 2012. In addition to these undisputed facts, MDS also alleges that during the negotiations, Mid-State represented that the replacement trucks came with "second generation" MaxxForce engines.

¶33    We conclude, as did the circuit court, that Defendants are entitled to summary judgment dismissing these claims against Mid-State for breach of contract and breach of express warranty because the undisputed facts show that any verbal statements Mid-State made to MDS were not part of the fully integrated sales contracts and the sales contracts contained valid warranty disclaimers denoting that the trucks were sold "AS IS" and without warranties.

¶34    An integration clause, generally speaking, is a clause that "demonstrates that the parties intended the contract to be a final and complete expression of their agreement." *Town Bank v. City Real Estate Dev., LLC*, 2010 WI 134, ¶39, 330 Wis. 2d 340, 793 N.W.2d 476. Further, the parol evidence rule has been summarized as follows:

> "When the parties to a contract embody their agreement in writing and intend the writing to be the final expression of their agreement, the terms of the writing may not be varied or contradicted by evidence of any prior written or oral agreement in the absence of fraud, duress, or mutual mistake."

*Id.*, ¶36 (quoting *Dairyland Equip. Leasing, Inc. v. Bohen*, 94 Wis. 2d 600, 607, 288 N.W.2d 852 (1980). The rule is designed to promote "the integrity, reliability, and predictability of written contracts and to reduce the threat of juries being

17

misled or confused by statements or negotiations that may have taken place before a contract was entered into." *Id.*, ¶36.

¶35　In each of the ten 2016 sales contracts for the ten replacement trucks, a box is checked indicating the trucks were sold "AS IS – NO WARRANTY. DEALER DISCLAIMS ALL WARRANTIES INCLUDING IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE."　In addition, the sales contracts included an integration clause that read as follows:

> No oral representations are binding unless written on this form.　The document (including the reverse side and the Buyer's Representations Statement) is the entire agreement between You and Dealer, and supersedes any prior agreements and representations, regarding the transactions described above.　No modification or waiver of this agreement is enforceable against either party unless agreed to in writing by that party.　You will receive a copy of this order.

¶36　Despite this language, MDS argues that the sales contracts between Mid-State and MDS cannot have been fully integrated because Mid-State and MDS also executed transfer forms that transferred Navistar's extended warranties for the replacement trucks from Roehl to MDS as part of the 2016 trade. According to MDS, the transfer forms are significant because they show that "either there were two stand-alone agreements, one of which had no disclaimers or integration clause, or there was one agreement with internally inconsistent, and thus ambiguous provisions" and that "[e]ither way, resort to extrinsic evidence is allowed."　In support of its argument, MDS quotes *Federal Deposit Insurance Corp. v. First Mortgage Investors*, 76 Wis. 2d 151, 158, 259 N.W.2d 362 (1977), for the proposition that "[p]arol evidence is always admissible with respect to the issue of integration, that is, parol evidence is admissible to show whether the

18

parties intended to assent to the writing as the final and complete (or partial) statement of their agreement."

¶37 MDS's argument is defeated by our supreme court's decision in *Town Bank*. In discussing the language quoted above upon which MDS relies, the *Town Bank* court clarified that "when the contract contains an unambiguous merger or integration clause, the court is barred from considering evidence of any prior or contemporaneous understandings or agreements between the parties, even as to the issue of integration." *Town Bank*, 330 Wis. 2d 340, ¶¶38-39.

¶38 We conclude that the integration clause is unambiguous and that the sales contracts here are fully integrated. The integration clause expressly states that "[n]o oral representations are binding unless written on this form." It further states that the sales contract "is the entire agreement between You [MDS] and Dealer [Mid-State], and supersedes any prior agreements and representations, regarding the transactions described above." Therefore, there can be no resort to either the extended warranty transfer forms or to any statements that Mid-State employees may have made to MDS to determine the terms of the contract. Moreover, the sales contracts state that Mid-State is selling each replacement truck "as is" and that Mid-State disclaims warranties, including implied warranties of merchantability and fitness for a particular purpose. That Mid-State transferred Navistar's extended warranties from Roehl to MDS does not make the integration clause in Mid-State's sales contract with MDS ambiguous or the sales contract not fully integrated, nor is the integration clause defeated by this separate transaction involving Navistar's extended warranty.

¶39     Based on the foregoing, we conclude that Defendants are entitled to summary judgment dismissing the claims in these counts against Mid-State for breach of contract and breach of express warranty.

*IV. Count Six Against Mid-State: Fraudulent Representation Under*
    *WIS. STAT. § 100.18(1)*

¶40     Count six of MDS's amended complaint alleges that Mid-State made fraudulent representations under WIS. STAT. § 100.18(1) in stating that the replacement trucks had next generation MaxxForce engines that were much more reliable than those MDS previously purchased.   Section 100.18(1) provides in relevant part:

> No person, firm, corporation or association, or agent or employee thereof, with intent to sell ... merchandise ... or with intent to induce the public in any manner to enter into any contract or obligation relating to the purchase, ... shall make, publish, disseminate, circulate, or place before the public, or cause, directly or indirectly, to be made, published, disseminated, circulated, or placed before the public, ... an advertisement, announcement, statement or representation of any kind to the public ... contain[ing] any assertion, representation or statement of fact which is untrue, deceptive or misleading.

This section is part of Wisconsin's Deceptive Trade Practices Act, the purpose of which is "'to protect consumers from untrue, deceptive or misleading representations to promote the sale of a product.'"   ***Hinrichs v. Dow Chem. Co.***, 2020 WI 2, ¶49, 389 Wis. 2d 669, 937 N.W.2d 37 (quoting ***Bonn v. Haubrich***, 123 Wis. 2d 168, 173, 366 N.W.2d 503 (Ct. App. 1985)).   It is also intended "'to deter sellers from making false and misleading representations in order to protect the public.'"   ***Hinrichs***, 389 Wis. 2d 669, at ¶49 (quoting ***Novell v. Migliaccio***, 2008 WI 44, ¶30, 309 Wis. 2d 132, 749 N.W.2d 544).   A claim made pursuant to WIS. STAT. § 100.18(1) must allege facts that would fulfill three elements: (1) the

defendant made a representation to one or more members of the public with the intent to induce an obligation; (2) the representation was untrue, deceptive or misleading; and (3) the representation materially induced a pecuniary loss to the plaintiff. *Hinrichs*, 389 Wis. 2d 669, ¶85.

¶41 Because we conclude that MDS fails to present any facts showing that it fulfills the first element, Mid-State is entitled to summary judgment dismissing MDS's fraudulent representation claim. *See Schurmann v. Neau*, 2001 WI App 4, ¶7, 240 Wis. 2d 719, 624 N.W.2d 157 (2000) ("[W]hen an essential element of a claim cannot be proved under any view of the facts, summary judgment is appropriate."); *Barrows*, 352 Wis. 2d 436, ¶9.

¶42 As stated, to prevail on a claim under WIS. STAT. § 100.18(1), a plaintiff must demonstrate that the defendant made a representation to "the public." *Hinrichs*, 389 Wis. 2d 669, ¶58. "The public" is not defined in § 100.18(1), although courts have interpreted the phrase. *Id.*, ¶61. For example, courts have rejected the proposition that statements made in private were not made to "the public." *See State v. Automatic Merchs. of Am., Inc.*, 64 Wis. 2d 659, 664, 221 N.W.2d 683 (1974). Courts have also recognized that "'the number of people involved is not controlling and that "the public" may be only one person.'" *Hinrichs*, 389 Wis. 2d 669, ¶61 (quoting *Automatic Merchs.*, 64 Wis. 2d at 664). Rather, in examining whether a plaintiff is a member of "the public" under § 100.18(1), "'[t]he important factor is whether there is some *particular relationship* between the parties.'" *Id.* (emphasis added).

¶43 Courts have analyzed what constitutes a "particular relationship" for purposes of "the public" component. For example, in *Kailin v. Armstrong*, 2002 WI App 70, ¶¶44, 49, 252 Wis. 2d 676, 643 N.W. 2d 132, this court affirmed

summary judgment in the defendant's favor where the plaintiffs' claim relied on statements made after the plaintiffs had entered into a contract with the defendant for the subject property. We concluded that at the time of the defendant's statements the plaintiffs "were no longer 'the public' under [§ 100.18(1)] because they had a particular relationship with [the defendant]—that of a contracting party to buy the real estate that is the subject of his post-contractual representation." *Kailin*, 252 Wis. 2d 676, ¶44.

¶44 Our supreme court has also articulated certain factors that may be relevant in determining whether a "particular relationship" exists between the parties. In *K & S Tool & Die Corp. v. Perfection Machinery Sales, Inc.*, 2007 WI 70, ¶23, 301 Wis. 2d 109, 732 N.W.2d 792, the court upheld the circuit court's denial of Perfection's motions challenging the sufficiency of the evidence at the close of K & S's case and following a verdict in K & S's favor. Perfection argued that a particular relationship existed between it and K & S, such that K & S fell outside the scope of "the public" for the purpose of WIS. STAT. § 100.18(1). *K & S Tool & Die Corp.*, 301 Wis. 2d 109, ¶28. In concluding that the circuit court did not erroneously exercise is discretion in denying Perfection's motions, our supreme court explained that "[b]ased on the evidence, a reasonable jury could have made conflicting inferences or found in either party's favor." *Id.*, ¶¶29, 30.

¶45 The *K & S* court then discussed evidence which might support a finding that a particular relationship existed and evidence that might lead to the opposite conclusion. *Id.*, ¶¶31-32. Some factors supporting the existence of a particular relationship included that K & S had made a purchase in the past from Perfection and that, prior to the transaction at issue, Perfection had agreed to look for the product that was the subject of the dispute for K & S. *Id.*, ¶31. On the other hand, factors that might cut against a finding of a particular relationship

included that K & S's prior purchase from Perfection occurred approximately four years prior to the disputed transaction, that K & S "had purchased nothing else either before or after that purchase," and that "[t]he purchase could be construed as too isolated to establish a particular relationship." *Id.*, ¶¶4, 32. Regarding Perfection's agreement to look for the product that was the subject of the dispute, the court posited that the statement from a Perfection sales representative that he "always" tried to help customers in the same way he offered to help K & S, might also lead a jury to conclude that the parties did not have a particular relationship and that K & S was therefore a member of the public. *Id.*, ¶32.

¶46 Although not controlling, a federal district court has also examined whether a "particular relationship" exists for purposes of interpreting "the public" under WIS. STAT. § 100.18(1). *See Uniek, Inc. v. Dollar Gen. Corp.*, 474 F. Supp. 2d 1034, 1038 (W.D. Wis. 2007). In *Uniek*, the court granted summary judgment to defendants, concluding that the plaintiff was not a member of the public for purposes of § 100.18(1). *Id.* at 1039-40. The court based its decision on the undisputed facts showing that there was an ongoing relationship between the parties for thirteen years, with as much as $12 million of merchandise sold in a single year. *Id.* at 1039. In addition, the parties had entered into a letter of understanding under which plaintiff became defendant's core picture frame supplier. *Id.* at 1039-40. The court concluded: "If this relationship does not "distinguish" plaintiff from "the public," then virtually nothing would.… Because current Wisconsin case law adheres to the view that "the public" does restrict the

beneficiaries of Wis. Stat. § 100.18(1), I must grant defendant's motion for summary judgment." *Id.* at 1040.[13]

¶47 In this case, the undisputed facts show that, at the time of the 2016 trade, the parties had a particular relationship that precluded MDS's membership in "the public" under WIS. STAT. § 100.18(1). MDS's president and owner, T.J. Alfuth, testified at his deposition that since at least the 1990s, he has purchased his trucks only from Mid-State, usually through Mid-State's president, Jon Vandehey. MDS also does not dispute that Alfuth purchased only Navistar-built International brand trucks and that, since 2003, Mid-State has sold over $2.5 million worth of International brand trucks to MDS and its predecessor companies. Alfuth acknowledged that he reached out to Mid-State in response to the problems with the 2013 trucks because of his "particular longstanding relationship" with Vandehey. Alfuth also conceded that he initiated contact with Vandehey at Mid-State in 2012 for the original fifteen trucks and that he did not consider using an alternative dealer when seeking a solution for the replacement trucks. In addition, Mid-State's Repair Advocate stated that over the years, he has had "numerous conversations" with Alfuth and with MDS's Terminal Manager Gary Cooper in which he would make determinations as to whether MDS's repairs were covered by Navistar's warranty.

¶48 MDS argued in the circuit court, as it does on appeal, that even though Alfuth also owned all of MDS's predecessor companies, the court may not

---

[13] The court presumed that the rationale for the "particular relationship" standard "is that those who have long-term, established relationships are in a better position than most to protect themselves in the context of that relationship." *Uniek, Inc. v. Dollar Gen. Corp.*, 474 F. Supp. 2d 1034, 1039 (W.D. Wis. 2007).

consider the time period before MDS was formed in 2012 and that "[a]t most, MDS's relationship with Mid-State spanned a period of four years by the time of the [2016] trade deal."[14] However, even accepting MDS's argument that only the four-year period from 2012 to 2016 may be considered, as the above-summarized facts demonstrate, that four-year period also establishes a significant relationship during which the parties communicated frequently and Mid-State executed numerous repairs on the twenty-five trucks at issue in this litigation.

¶49 Accordingly, we conclude that Mid-State is entitled to summary judgment dismissing MDS's fraudulent representation claim because there is no genuine dispute of material fact with respect to "the public" component of that claim under WIS. STAT. § 100.18.

V. *Pro Hac Vice Fees and Video Deposition Costs*

¶50 MDS argues that the circuit court erroneously exercised its discretion in awarding certain costs and fees.[15] Defendants' bill of costs, which

---

[14] MDS suggests that, either because of MDS's changes in corporate form or because Mid-State proposed the 2016 trade deal, Mid-State solicited MDS's business anew and that this case is therefore governed by *United Concrete & Construction Inc. v. Red-D-Mix Concrete, Inc.*, 2013 WI 72, 349 Wis. 2d 587, 836 N.W.2d 807. However, the proposition upon which MDS relies comes not from our supreme court's decision, but rather from this court's unpublished per curiam opinion, *United Concrete & Construction, Inc. v. Red-D-Mix Concrete, Inc.*, No. 2011AP1566, unpublished slip op. (Wis. Ct. App. June 13, 2012). Although the supreme court's *United Concrete* opinion summarizes this court's opinion, that summary does not represent a supreme court conclusion, as MDS represents. *United Concrete*, 349 Wis. 2d 587, at ¶10. Instead, the supreme court explicitly declined to address the "particular relationship" issue because that issue was not included in the petition for review. *Id.*, ¶18. We further note that a party shall not rely on or cite a per curiam opinion. WIS. STAT. § 809.23(3).

[15] MDS argues that the circuit court "abused its discretion" in awarding fees and costs, but we no longer use this phrase due to its unjustified negative connotations. *City of Brookfield v. Milwaukee Metro. Sewerage Dist.*, 171 Wis. 2d 400, 423, 491 N.W.2d 484 (1992). Instead, we use the locution "erroneous exercise of discretion." *Id.*

the court granted in full, totaled $12,788.72, which included $4,850.75 in costs for video depositions and $1,000 in pro hac vice admission fees. MDS argues that the court erred in awarding costs for video depositions because the video depositions were not "necessary disbursements" under WIS. STAT. § 814.04(2). MDS also argues that the court erred in awarding pro hac vice fees because the fees were unnecessary and not authorized by statute.

¶51    The authority of the circuit court to award costs to the prevailing party is governed by WIS. STAT. § 814.04. *Alswager v. Roundy's Inc.*, 2005 WI App 3, ¶9, 278 Wis. 2d 598, 692 N.W.2d 333. The award of costs may include attorney fees, certain specified costs, and "all the necessary disbursements and fees allowed by law." WIS. STAT. § 814.04(1) and (2). Whether a given expense is a necessary cost that should be awarded to a prevailing plaintiff is a matter within the circuit court's discretion. *DeWitt Ross & Stevens, S.C. v. Galaxy Gaming & Racing Ltd.*, 2004 WI 92, ¶21, 273 Wis. 2d 577, 682 N.W.2d 839. "We will uphold the circuit court's exercise of discretion, provided that it examined the relevant facts, applied a proper standard of law, and, using a demonstrated rational process, arrived at a conclusion that a reasonable judge could reach." *Id.*

A.  *Video Depositions*

¶52    Costs for depositions are allowable under WIS. STAT. § 814.04(2). Here, Defendants were awarded costs for video depositions in the amount of $4,850.75, while also being awarded costs for transcription of those same depositions. MDS argues that the video depositions were not "necessary disbursements" under § 814.04(2) and that the award of such costs was contrary to *Alswager*, in which this court concluded that a party who had a "perfectly usable"

recorded audio file could not be awarded costs for a transcript of the audio file that was "merely for its own convenience." *See Alswager*, 278 Wis. 2d 598, ¶14. MDS states that the witnesses that Defendants deposed were all located in Wisconsin and that the depositions were taken in Madison. MDS argues that there was no need to preserve the deponents' testimony for trial because they would all be available for trial.

¶53 As noted by the circuit court, video depositions are specifically authorized by WIS. STAT. § 885.42(1), which states in relevant part that "[a]ny deposition may be recorded by audiovisual videotape without a stenographic transcript." Moreover, our supreme court has held that a prevailing party may recover as statutory costs the expense of having both a videographer and a court reporter record the same deposition. *See DeWitt*, 273 Wis. 2d 577, ¶2. In so holding, the court noted that WIS. STAT. § 885.45(2) specifically provides that "the reasonable expense of recording testimony on videotape shall be costs in the action." *Id.*, ¶57. The court concluded:

> Although Wis. Stat. § 885.45 does not contain a specific provision about transcription, Wis. Stat. § 814.04(2) allows an award of costs to the prevailing party for "depositions including copies." We agree with DeWitt that this case is not a situation where the transcripts were obtained solely for the convenience of counsel. Rather, the deposition transcript was necessary for DeWitt's summary judgment motion because of the supporting papers requirement contained in Wis. Stat. § 802.08. Accordingly, we determine that the circuit court erroneously exercised its discretion in denying DeWitt the cost of the deposition transcript.

*Id.*, ¶58 (citation and footnote omitted). Although the situation here is the reverse of *DeWitt* in that MDS challenges the video component of the deposition rather than its transcription, *DeWitt* nevertheless negates MDS's suggestion that a prevailing party may not be awarded costs for both the videotaping and

27

transcribing the same deposition. As *DeWitt* notes, an award of video deposition costs is explicitly authorized by WIS. STAT. § 885.45. *Id.*, ¶57. Additionally, the allowance in WIS. STAT. § 814.04(2) for an award to the prevailing party for "depositions including copies" provides the authority for the granting of costs required for the transferring of videotape depositions to transcripts as necessitated by the supporting papers requirement contained in WIS. STAT. § 802.08. *See id.*, ¶58. Accordingly, we conclude that the circuit court did not erroneously exercise its discretion by awarding video deposition costs to Defendants.

### B. *Pro Hac Vice Fees*

¶54 MDS argues that an award of $1,000 in pro hac vice admission fees was not explicitly authorized by statute and that therefore the circuit court did not have the authority to allow them. *See Kleinke v. Farmers Coop. Supply & Shipping*, 202 Wis. 2d 138, 149, 549 N.W.2d 714 (1996) (court does not have power to allow costs not explicitly authorized by statute). Specifically, MDS contends that costs associated with pro hac vice admissions are not specifically authorized under WIS. STAT. § 814.04 and are not appropriately awarded pursuant to a court's discretionary power under Wisconsin's omnibus costs provision, WIS. STAT. § 814.036.

¶55 In concluding that Defendants were entitled to costs for pro hac vice admissions, the circuit court agreed with Defendants that the $1,000 incurred for pro hac vice admissions was an expense "actually paid out for certified or other copies of papers and records in any public office" pursuant to WIS. STAT. § 814.04(2) and was a discretionary taxable cost under WIS. STAT. § 814.036. To support its argument under § 814.04(2), Defendants contended that the pro hac vice fee must be paid in order for the court to issue the pro hac vice order, which is

28

a "public record." Defendants also argued that the fee meets the discretionary criteria under WIS. STAT. § 814.036 because "it is a fee made necessary in order to participate in this action, akin to a filing fee."

¶56     We disagree that pro hac vice admission fees are properly considered an "amount[] actually paid out for certified and other copies of papers and records in any public office." *See* WIS. STAT. § 814.04(2). This provision is clearly aimed at awarding costs for already existing documents, not costs associated with procuring a court order such as an order granting pro hac vice admissions.[16]

¶57     Likewise, the awarding of pro hac vice admission fees is not authorized under Wisconsin's omnibus costs provision, WIS. STAT. § 814.036, because that provision "only gives the court discretion as to *when* it may allow costs, not as to *what* costs may be allowed." **Kleinke**, 202 Wis. 2d at 149. Because the pro hac vice admission fees are not explicitly authorized by statute, the omnibus costs provision provides no authority for a circuit court to award them as part of a costs award. *See id.* Thus, the court's order granting costs for pro hac vice admissions was an erroneous exercise of discretion. **DeWitt**, 273 Wis. 2d

---

[16] In concluding that the fee was a "public record" under WIS. STAT. § 814.04(2), the circuit court cited **State ex rel. Mitsubishi Heavy Industries America, Inc. v. Circuit Court for Milwaukee County**, 2000 WI 16, 233 Wis. 2d 1, 605 N.W.2d 868. **Mitsubishi** is inapposite. While the **Mitsubishi** court stated that documents on file with a court or custodian may be considered public records, 233 Wis. 2d 1, ¶19, the case addressed the propriety of a news organization seeking to intervene in a negligence action and be granted access to unfiled, pretrial discovery materials, 233 Wis. 2d 1, ¶¶2-3. The **Mitsubishi** court determined that the circuit court should not have allowed the news organization to intervene. *Id.*, ¶30. This holding, related to access to court documents by third-party intervenors, is not germane to the issue of whether parties to an action may seek reimbursement for costs. The **Mitsubishi** court did not discuss WIS. STAT. § 814.04(2).

577, ¶21 (failure to apply proper legal standards constitutes an erroneous exercise of discretion).

¶58 We also reject Defendants' argument that MDS is barred from challenging these fees because MDS did not object to the pro hac vice admissions when Defendants requested them. Instead, we conclude that MDS's objection to costs adequately preserved this issue for appeal.

¶59 In sum, we uphold the award of costs related to the video depositions, but we conclude that the circuit court's award of costs for Defendants' pro hac vice admissions was an erroneous exercise of discretion. Accordingly, the award of costs is reduced by $1,000.

## CONCLUSION

¶60 For the reasons stated above, we affirm the circuit court's orders granting summary judgment to Defendants, affirm the court's award of costs for video depositions, and reverse the court's award of costs for pro hac vice fees. We modify the judgments to reduce the award of costs by $1,000 and affirm the judgments as modified.

*By the Court.*—Judgments modified and, as modified, affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.